FERGUSON *v.* LITTLE ROCK TRUST COMPANY.

Opinion delivered April 17, 1911.

1. FRAUDULENT CONVEYANCE—PRESUMPTION.—Fraud is never presumed, but must be proved, and this may be done by inference from circumstantial evidence, but no such inference can arise from doing an act warranted by law. (Page 53.)

2. HOMESTEAD—RIGHT OF DEBTOR TO ACQUIRE.—An insolvent debtor may exchange lots which are subject to the claims of his creditors, but upon which they have no liens, for a homestead which is not subject to their claims. (Page 53.)

3. SAME—RIGHT TO ACQUIRE BY EXCHANGE.—Where a father, being insolvent, in good faith conveyed lots owned by him which were subject to the claims of his creditors, to his daughter in exchange for a homestead, and the lots so conveyed did not greatly differ in value

from the homestead, the conveyance was valid, though the creditors were thereby deprived of property that could have been subjected to the payment of their debts if such exchange had not been made. (Page 55.)

Appeal from Pulaski Chancery Court; *John E. Martineau,* Chancellor; reversed.

### STATEMENT BY THE COURT.

Appellee on August 27, 1908, sued the Ferguson Lumber Company and W. B. Ferguson in the Pulaski Circuit Court on his note to it, and attached lots 3, 4, 5, 6, 7 and 8, block 4, Marshall & Wolf's Addition to Little Rock, Arkansas, charged to have been fraudulently transferred by him to his daughter, Mary Louise Ferguson.

The case was transferred to equity and consolidated with one brought in that court by appellee against W. B. Ferguson, Mary E. Ferguson, Mary L. Ferguson, Charles E. Ferguson, as trustee, and individually, and others (all of whom were duly served with process or answered except Mary E. Ferguson), to set aside the conveyance of said lots by said W. B. Ferguson to his daughter, Mary Louise Ferguson, as fraudulent, and also certain mortgages therein claimed to be fraudulent and long held from record and recorded in fraud of creditors.

W. B. Ferguson answered, denying all the allegations of fraud, and alleged that the deed was executed to his daughter for a fair consideration, without fraud, and that the mortgages were recorded by his brother without his knowledge or consent, but that they were valid and given in good faith, to secure the amount of money borrowed which was unpaid, as shown by them.

C. E. Ferguson, as trustee and individually, answered admitting the filing of said mortgages for record on August 20, 1908; denied that it was done fraudulently or as the tool of W. B. Ferguson, and says it was done without the knowledge or consent of the said W. B. Ferguson, and that only the one given to the trustees of his brother, Walter, covered the lots in this suit.

Mary Louise Ferguson answered, denying all charges of fraud in purchasing said lots from her father, and alleged that the consideration was a deed from her to her father to a lot and improvements thereon of about equal value, which she inherited from her mother; denied her deed was withheld from record; stated it was acknowledged by her stepmother in Detroit, Michi-

gan, on August 17, and filed for record soon thereafter; admitted she executed a mortgage for $10,000 on said lots to be expended in building four houses on same, as she had a right to do, and that she intended to buy lumber to build them from the Ferguson Lumber Company, and did put some on the ground therefor; that her father was acting for her in whatever she did in that regard, and that there was no collusion or fraud in the matter; that it was untrue that any mortgage in favor of her grandmother, Mary E. Ferguson, was filed for record on said lots; that a mortgage for $5,000 was executed on them by her father prior to his transfer of them to her, but that same was owned by her said grandmother, and was willed to her in part, and was expected to be paid off by her father at any time."

The record in this case is voluminous, the testimony on the one hand showing the organization of corporations by W. B. Ferguson and increase and inflation of their capital stock on a large scale, with little actual capital, and for the purpose of securing credit, and creditors unpaid, if not defrauded, and is replete with transactions showing the tortuous course of said Ferguson, unscrupulous in securing his own individual interest and benefit, in disregard of the rights of some of his creditors, and not consistent with that honesty and fair dealing that the appellee had the right to expect of him.

He insisted that his actions were entirely in good faith, and compelled by the stress of circumstances caused by the panic and the refusal of appellee to extend him further credit, and its insistence upon the payment or further security of the amount already due and owed to it by his said corporation and himself. It is only necessary, however, in our view of the law of the case, to set out such portions of the testimony as relate to the conveyance of the lots to the daughter and the considerations therefor with the circumstances surrounding the transaction.

Mary Louise Ferguson was his daughter by a former marriage, and had been residing with his family; came of age in 1907, and was, at the time of the execution of the said deed, staying with her grandmother in Detroit, Michigan, attending school. She inherited the family homestead from her mother; to whom it had belonged, and which was of about the same value as the lots conveyed to her by her father in exchange therefor.

She had not been at home with the family for more than a year, and was not expected to return in the summer of 1908. Disaster came upon the Ferguson corporations, caused, he states, by the panic and appellee's persistent insistence upon his paying the amount due it, and failure and bankruptcy were impending and inevitable. He sent his wife to Detroit with the deed to be executed by his daughter for the homestead upon which he lived, and also with the deed conveying the six lots in controversy in exchange therefor, already acknowledged by himself, together with a mortgage to be executed by Mary Louise Ferguson upon the lots which were conveyed to her by her father, to secure the payment of a loan of $10,000 to her from the Citizens' Investment Company of Little Rock.

Her statement of the transaction was as follows: "I live with my parents at 808 Battery Street, Little Rock; was 19 years of age in June, 1909; was with my father's mother in Detroit on August 1, 1908, and had been with her for two years; during that time I visited in Little Rock two months, June and July, 1907, and two weeks at Christmas; was attending school there; came home during vacation. Father did not visit me in 1907, but did in May and September, 1908. In August or September those papers concerning the transfer of the homestead for the lots were presented to me. I haven't got them; they are in my father's keeping. I deeded them the homestead, and then my father deeded me the lots; then I signed the mortgage on the lots, all at one time. Father sent them to me by my mother; I signed them at the office of James H. McDonald, the family counsel in Detroit. Mother told me exactly what the papers meant, and said I must decide for myself whether I wanted to make the exchange, just as father had written me. He said he thought that it would be better all around if he owned the homestead, and I the lots, because in that way I could get an income from the lots, and I could not from the homestead. · Mother told me that, and said I would simply be exchanging the homestead for the eight lots. The letter was written just before she came; I destroyed it with my other letters in Detroit in December of that year; had no talk with my father or mother before doing so. I read the deed I signed and handed it back to her; mother sent the papers by mail for record; I came back to Little Rock in June.

and have been here ever since with father.   He wrote me about building on the lots about the time he did about the deed, and mother explained that to build on them I could get an income to put me through school; at that time I had not seen father to talk with him about it, but did in September.   The mortgage was for $10,000, and I think it was to be paid at a specified time, and do not remember how it was to be paid.   Father was attending to that.   Didn't think much about how it was to be paid back; was going to school, and my mind was not on such subjects.   I left that to my father."

On cross examination: "The lawyer went over the transaction thoroughly with me, explaining it, and made me understand all before I signed, and my stepmother explained them to me; I suppose deeds have to be recorded, and it had to be recorded in this county.   The mortgage was sent at the same time.   My father wrote me fully, and mother explained it more fully when she came.   I intend to go to some other school, but my home is still with my father here.   I destroyed all my letters in Detroit, because I did not want to be burdened with them.   I never keep any of my letters."

The deed conveying the eight lots to her was dated August 1, 1908, and filed for record in Pulaski County, August 20, 1908, and recited a consideration of one dollar and a deed from her to lot 10, block 4, the homestead.

On the same date, August 20, mortgages on these lots from W. B. Ferguson to secure the payment of $5,000 that had been executed in 1903 were filed for record, also for the same amount on the homestead place conveyed by the daughter to her father, which mortgage was also executed in 1903.

These mortgages were filed by Charles E. Ferguson, "without the knowledge of W. B. Ferguson, because he thought they ought to be filed, and realized that his brother's business and mill affairs were getting in bad shape and would not last long."

"When the mortgage was given on the lots in controversy, my brother Walter wasn't well, and I supposed when he died, and my mother died, it would be closed out between my brother and myself by settlement without its having to go on record. It has not been settled that I know of." He also stated that his mother succeeded to the ownership of it on Walter's death, and

that he thought his brother 'W. B.' had told him that it had been "satisfied or given to him by our mother."

W. B. Ferguson stated: "That his daughter, Mary Louise, inherited from her mother the lot on which the homestead is located, and it had been his intention, as soon as she came of age, to exchange the lots in this suit for it; that she came of age in June, 1908, and was in Detroit with her grandmother at the time, attending school, and decided the latter part of June not to visit home during the summer; that his wife decided to spend the summer there. We talked the transfer over, and my wife went there the latter part of July, taking the deeds, the one we had signed to the lots in question, and the one to the homestead to be signed by her. Being her last year in preparatory school, and she intending to go to college, I arranged with the Citizens' Company for her a loan of $10,000, secured by mortgage on the lots, to be used in building four houses thereon. When it and the deed came back, I got the loan credited to account of Mary Louise and with her check for $3,000 thereon, purchased a New York draft for that sum and took it to the Laclede Bank at St. Louis, where the company had long been doing business, and credited it to the Ferguson Lumber Company. It, being in the business, was to furnish lumber for the houses, and this was an advance payment thereon; I sent out checks on this deposit at St. Louis to various creditors of the Lumber Company, among which was one to appellee, which was paid to it; the others were not paid because of the notice of the appellee stopping payment. The value of improvements on homestead lots was $10,000, which was principally on the one purchased of Mary Louise. The value of that lot and the six vacant lots exchanged for it were approximately equal. I wrote her explaining fully what the papers meant and the result of her executing them and of our executing the deed to her; that we wanted to get the homestead in our name, and at the same time do right by her. She was intending to go to a more expensive school, and desired an income for that purpose. Acting for her, I was going to build the houses through the Mill Company, which was to be sole contractor, and had plans made accordingly by Architect Whitehead. They were completed in August after the transfer was made. Deed was not withheld

from record, but filed soon after its acknowledgment. I filed it as soon as I got it by mail. The foundation, lumber, sills, joists, etc., had been delivered on the ground when payments were stopped; the houses would have rented for $35 or $40 per month for two-story eight-room houses, and they would have been completed by December 1, 1908. I expected enough rent in excess of her expenses to pay off the loan, and so took building association stock for her for that purpose. All I did was as her agent. There was no mortgage on the lots in suit executed by me. There was a $5,000 mortgage given by me on them to my brother Walter, which my mother inherited from him. She told me, if I insisted on it, she would have it satisfied or cancelled, but I did not insist, and it was not done. Under her will, my two daughters get all claims my mother had on my property that I own or did own. That mortgage was not recorded because there were but two heirs, and we thought it unnecessary to record it; that my share in her estate would cancel it when she died. It was in my brother's hands, and he filed it the morning of the same day the Citizens' Company filed its mortgage in the afternoon. When that exchange was made, it was to the interest of my creditors, because the Company would get $10,000 out of the contract to build the houses at a profit, and I did not consider either the company or myself insolvent then. I had but few debts outside of my indorsement for the company. I thought, with the use of that money in its treasury, and holding it as a reserve, I could pull it through, as the stringency was over, and I still think I could have done so had it not have been for the proceedings taken against me. My whole action was for the benefit of my creditors, and every dollar I got hold of was paid to them at once. Three thousand dollars of the loan was checked out to them at once, of which appellee got $500. This was put in the St. Louis bank, where we had an account and did more than half our business. There was no intention to injure or defraud them. I acted in good faith. My daughter knew nothing of my financial condition."

The chancellor found that the deed was executed in fraud of creditors, and cancelled it, and decreed a sale of the lots for the payment of the judgment of appellee, free from all liens and

incumbrances and claims of every kind, and from this judgment the appeal was brought.

*Marshall & Coffman* and *Ratcliffe, Fletcher & Ratcliffe,* for appellants.

1.  The transfer of the six lots in question could not have been fraudulent because they were exchanged by the debtor for his homestead lot of about equal value. 79 Fed. 706; 34 S. W. 1013; 43 N. W. 52; 43 Fed. 702; 56 Ark. 253; 76 Ark. 952; 11 Allen 145; 25 Mich. 367; 15 Tex. 175; 53 Ill. 346; 10 Cal. 491; 22 Kan. 336; 54 Fed. 70.

2.  Even if the lot exchanged for had not been a homestead, there is no proof of fraud on the part of the debtor in exchanging the lots in question for it. Mere embarrassment of a debtor is no indication that the deed is fraudulent. 26 Ark. 60. Fraud must be proved; mere suspicion is not enough. 63 Ark. 16. The burden is on the plaintiff to prove both intent and notice. 20 Cyc. 760. The fact that the land was sold to a relative is no badge of fraud, and does not shift the burden of proof. 20 Cyc. 451, 753.

3.  If the transfer of the lots were a fraud on the part of the vendor, there is no proof whatever that the vendee participated in or had notice of it. It is in evidence that the vendee gave full value for the lots; and even if she had not she is, under the proof, protected in her purchase. 31 Ark. 163; 79 Ark. 215; 20 Cyc. 465.

4.  If the court did not err in setting aside the deed to the lots, it certainly erred in cancelling the mortgage thereon and ordering them sold free and clear of same. 11 Ark. 378.

*Morris M. Cohn,* for appellee.

The deed of W. B. Ferguson to his daughter, and with the mortgage to the Citizens' Investment & Security Company, and the mortgage of 1903 on lots 3 to 8, of block 4, Marshall & Wolfe's addition, were, to all intents and purposes, mere sham conveyances, intended to furnish him with the means of using the property for his own uses and purposes under cover—a secret use, benefit or trust, condemned by the decisions of this court. 31 Ark. 666, 669-672; 33 Ark. 336, 337; 72 Ark. 58. See also 1 Smith's Leading Cases, 1 *et seq.;* Kirby's Dig. § 3666; 79 Ark.

399-401; 71 Ark. 611; 33 Ark. 762, 768.   Even if a deed from a debtor to his daughter be based upon a valuable consideration, yet if it be withheld from record so as to operate to deceive creditors, it is void as to creditors.   86 Ark. 230; 27 Neb. 586; 43 N. W. 411; 29 N. J. Eq. (2 Stew.) 487; 38 N. J. Eq. (11 Stew.) 282; 86 Va. 26; 9 S. E. 419; 70 Fed. 10; 116 Mass. 466; 30 Mich. 369; 61 Neb. 262; 85 N. W. 75; Federal Cases, No. 7635; *Id.* No. 986.   In determining the question of fraud the court will take into consideration all the facts and circumstances disclosed in the evidence touching the transactions of Ferguson, because of their obvious connection with one another and the final outcome of his enterprises.   75 Ark. 427; 47 Ark. 247; 42 Ark. 542; 29 Ark. 386; 14 Ark. 79.

KIRBY, J., (after stating the facts).   It is contended, on the one hand, that the conveyances were simulated and not *bona fide,* made with the understanding that W. B. Ferguson was to retain an interest in and control the property as he had done before and to shield it from his creditors, and, upon the other hand, that it was an actual exchange and transfer of property of approximately equal value by the said W. B. Ferguson to his daughter to secure for himself and his family the homestead occupied by them and owned by her.

Fraud is never presumed, but must be proved, which may be done by inferences from circumstances tending to show it; but no such inference can arise from doing an act warranted by law.   It is the policy of the law in this State to protect the home, and a debtor is allowed a homestead exempt from the claims of all his creditors.   As to it, there are no creditors, and there can be no fraudulent disposition of it.   The exemption laws operate alike in favor of the evil and the good, the just and the unjust.

W. B. Ferguson, without regard to any question as to the fairness or unfairness of his dealings in manipulating his corporations to secure credit, and with his creditors, regardless of whether they may have been deceived and misled to become such, had the right, under the law, to exemption of his homestead from their claims, if he had one, and equally the right, if he had none, of acquiring a homestead with any assets belonging to him that he could use for that purpose before his creditors fixed a charge or lien thereon.   This of course if the transaction

was made in good faith to acquire a homestead without regard to whether by so doing his creditors would necessarily be deprived of the price thereof, which they otherwise might have received on the payment of their debts.

In *First Nat. Bank* v. *Glass,* 79 Fed. 706, the Court of Appeals said: "An insolvent debtor may use with impunity any of his property that is free from liens and vested equitable interest of his creditors to purchase a homestead for himself and family in his own name. If he takes property that is not exempt from judicial sale and applies it to this purpose, he merely avails himself of a plain provision of the Constitution or statute enacted for the benefit of himself and his family. He takes nothing from his creditors by this action in which they have any vested right. The Constitution or statute exempting the homestead from the judgments of creditors is in force when they extend the credit to him, and they do so in the face of the fact that he has this right. Nor can the use of property that is not exempt from execution to procure a homestead be held to be a fraud upon the creditors of an insolvent debtor, because that which the law expressly sanctions and permits cannot be a legal fraud."

In *Finn* v. *Krut,* 34 S. W. 1013, the court approved the conclusion of law of the lower court: "If it be not a fraud to place property on hand, which is subject to execution, out of the reach of creditors by making a home on it, it cannot be fraudulent to exchange property which might have been thus converted into a home for other land, with the intention of converting the property acquired into a home. If there is no fraud on the part of the vendor, the vendee must be permitted to hold the land conveyed, because it is not on account of fraud on the part of the vendee that avoids the sale; it is the fraud of the vendor, brought to the knowledge of the vendee or of which he may have constructive notice, which avoids the sale. There cannot be a fraudulent purchaser without a fraudulent vendor. *Sanger* v. *Colbert,* 84 Tex. 673."

In *Jacoby* v. *Parkland Distilling Co.,* 43 N. W. 52, the debtor moved into property which he owned, to save it from execution. The court said he had a right to do this. "Even if he disposes of his property subject to execution for the very purpose of converting the proceeds into exempt property, this will not consti-

tute legal fraud. This he may do at any time before the creditors acquire a lien upon the property. It is a right which the law gives him, subject to which every one gives him credit, and fraud can never be predicated on an act which the law permits."

Our court has held that a debtor may fix his homestead upon any lands he may own, regardless of his debts and the rights of his creditors, if he can do so before liens attach. *Gibbs* v. *Adams,* 76 Ark. 577.

In this case Ferguson actually resided upon the premises and occupied them as a homestead, and, although he may have had a life estate therein, had the right to acquire the whole property as such homestead, that his widow and children might enjoy it after him, and he states it was his intention to do so in making the unconditional conveyance he did make to his daughter of the lots in controversy. She certainly had the right to exchange her title to this homestead for these lots if she cared to do so; and she has stated that she did this, as her unconditional transfer of the homestead in payment therefor shows. She is not shown to have been cognizant of the financial condition and embarrassment of her father, and there is no testimony whatever that there was any agreement or understanding that an interest was reserved in the lots conveyed by her father, or that he should thereafter derive any benefit from them. It is true that she at the same time executed a mortgage covering these lots to secure the payment of a loan of $10,000 at the suggestion of her father to be used in the construction of buildings thereon, to produce an income for her benefit, and it is also true that he was to expend this money in the construction of such buildings and intended to purchase the lumber from his lumber company with which to do it.

It will not be questioned that he had the right to contract for these buildings and furnish the material therefor. Of course, this exchange of property and these conveyances do have the effect of depriving the creditors of this debtor of property that was not exempt from their claims before the exchange, but the debtor could purchase and acquire a homestead knowing that this would be true, without any fraud, so far as their claims were concerned.

We hold the proof is not sufficient to show this exchange of property merely colorable and simulated with the intent and

purpose of shielding the lots conveyed to the daughter from the claims of her father's creditors, and that, since it was an actual *bona fide* transaction to acquire a homestead, which the debtor had the right to do, his conveyance to his daughter of said lots, not greatly differing in value from the homestead conveyed to him in payment therefor, was valid and not fraudulent as to creditors, even though they are thereby deprived of property that could have been subjected to the payment of their debts, if such exchange had not been made.

It follows that the decree of the chancellor was erroneous, and it is reversed, and the cause is remanded, with directions to enter a decree in accordance with this opinion dismissing the complaint for want of equity.

Justices WOOD and FRAUENTHAL dissent.