HARMON *v.* McSPADDEN.

## Opinion delivered May 23, 1927.

1. FRAUDULENT CONVEYANCES—INADEQUACY OF PRICE.—Inadequacy of price is not of itself sufficient to justify the court in holding a debtor's conveyance fraudulent.

2. FRAUDULENT CONVEYANCES—SUFFICIENCY OF EVIDENCE.—Inadequacy of price together with other circumstances indicating fraud, *held* to justify the finding that a debtor's transfer of property was fraudulent.

3. FRAUDULENT CONVEYANCES—BURDEN OF PROOF.—Fraud in the conveyance of property must be proved and will never be presumed.

4. FRAUDULENT CONVEYANCES—PRESUMPTION OF FRAUD.—Indebtedness or insolvency at the time of a conveyance creates a *prima facie* presumption of fraud.

5. FRAUDULENT CONVEYANCES—INADEQUACY OF CONSIDERATION.— Where the disparity of consideration of a conveyance by a debtor is deliberate with the intention to defraud creditors, the transaction is void as to them, and gross disparity may, under some circumstances, of itself, justify the inference that there was actual fraud.

Appeal from Independence Chancery Court; *L. F. Reeder,* Chancellor; affirmed.

*Cole & Poindexter* and *W. K. Ruddell,* for appellant.

*S. M. Bone* and *S. M. Casey,* for appellee.

MEHAFFY, J. The appellant, who was plaintiff below, filed suit in the Independence Chancery Court, alleging that he had theretofore obtained a judgment against T. F. Leonard and Virgie Leonard in the sum of $5,000, which remained unsatisfied, and an execution had been returned *nulla bona*. He alleged that, a few days before the judgment was obtained, said T. F. Leonard and Virgie Leonard had fraudulently conveyed to the appellants, W. A. and Leona Harmon, who were defendants below, certain described land. That, in furtherance of said fraudulent conveyance, the said Virgie Leonard permitted T. F. Leonard to take a conveyance of said land from W. L. Calaway, although she was the owner of the indebtedness against said land given by said Calaway, who purchased it, and that no consideraion passed between her and her husband at that time. That

the defendants knew about these things; that no cash consideration was paid by Harmon and wife, but they executed a note for $9,000 for the property, which was done for the purpose of defrauding and cheating plaintiff and preventing him from collecting his judgment.

Plaintiff alleges that, on the same day of the above conveyance to W. A. Harmon and wife, the said T. F. Leonard and Virgie Leonard transferred and conveyed to the said defendants, W. C. Robertson and Etta Robertson, his wife, certain other property, describing it, and that no cash consideration was paid, but a note executed for $4,500, and that this was done for the fraudulent purpose of assisting T. F. Leonard and Virgie Leonard to place the property beyond the reach of execution on the plaintiff's judgment. He further alleged that T. F. Leonard and Virgie Leonard had systematically and premeditatedly entered into a scheme and plan for the purpose of getting rid of their property and placing it beyond the reach of their creditors, and particularly this plaintiff; alleged that they have considerable assets, consisting of money and notes, concealed for the purpose of avoiding payment of judgment.

Answer was filed, denying the allegations of the complaint, and thereafter the plaintiff filed an additional pleading, alleging that the defendants, W. A. and Leona Harmon, were indebted to Leonard in the sum of $9,000, and that Robertson was indebted to Leonard in the sum of $4,000, and that they had disposed of their notes.

There was a decree by the chancery court in favor of McSpadden against the Harmons, directing them to pay into the court a sufficient sum of money to pay the judgment of McSpadden.

Thereafter the plaintiff filed a supplemental complaint, showing that the Harmons and Robertson had sold their notes and other property to one W. C. Hargrove of Pittsburg, Texas, and plaintiff asked that Hargrove be required to appear in the court. Plaintiff alleged that the three notes executed by Harmon provided

that, upon failure to pay one when due, or interest when due, all three notes became due.

The Leonards and Harmons filed joint answers, and, in the meantime, Hargrove, who claimed to have purchased the notes, brought suit in Texas against the defendants, and it appears that they had never been to Texas before, but they went down and were served with summons between trains in the suit by Hargrove. And they pleaded this suit as a bar. Hargrove was served with a copy of the pleading, but did not appear in this court. A certified copy of the judgment of the Texas District Court, showing a judgment against W. A. Harmon in favor of W. C. Hargrove in the sum of $9,645, together with a copy of the complaint of Hargrove against Harmon, was filed.

S. M. Casey testified that he was present, representing Lawrence McSpadden, and heard W. C. Hargrove testify in the bankrupt court in Texarkana, and that Leonard was also present. That Hargrove testified that he bought the notes from Leonard, August 9, 1924, being three $3,000 notes of W. A. Harmon and a $4,000 note of W. C. Robertson, two $1,000 notes of R. A. Leonard and $1,000 of Independence County scrip, making a total of $16,000, and that he was to pay Leonard $9,500, and that he paid him at that time $3,500, and the balance in six weeks. That all the payments were in actual cash, no written evidences of the transaction; and Leonard testified to substantially the same facts.

Hargrove lives at Pittsburg, Texas, about 350 miles from Batesville, and stated that he made no investigation before buying the notes; he did not know the people who gave the notes, and later cashed the scrip at par value. He also testified that he had sold the Robertson notes, but still had the Harmon notes.

Mr. Casey also testified that the notes sold to Hargrove and the scrip were worth $16,500, as they were well secured.

Harmon and Robertson both testified in the contempt case in August, 1925, that they had gone to Texas

and were sued by Hargrove. Harmon testified that he bought the property from Leonard and gave three $3,000 notes, and that his wife signed the notes, and that they did not pay any cash. He did not know that Leonard was going to sell the notes, and did not know that he had sold them until later. That he was sued in Texas on the notes on August 1. Papers were served on him as he went through Mount Pleasant, Texas. That he was only there 15 or 20 minutes; had to change cars there. That he was never in Texas before this time, and was on his way to Dallas to see his sister there, and stayed there about a week. That he had no property in Texas. He swore that he did not know he was going to be served, had no idea that he was. He made no arrangements with Leonard to go down to Texas. That he did not make any defense in the Texas case, for the suit was for the full amount of the three notes of $3,000 each. That he did not know that Hargrove owned the notes, although he knew that they were sold and that some one in Texas owned them. Did not see anybody down there but the sheriff, who delivered the summons; did not see Hargrove.

McSpadden undertook to collect his judgment by contempt proceedings, and the court below ordered Leonard to pay the money into court, and, upon his failure to do so, ordered him to jail, and an appeal was taken to this court, and this court held that there was no lien on Leonard's property, and that the judgment in this case amounted to imprisonment for debt, which was in violation of the Constitution.

The Harmons, Leonards and Robertsons were relatives, and, when Harmon went down to Texas and was sued, he did not know Hargrove and Hargrove did not know him. He was only at the station where he was served 15 or 20 minutes, and there was no explanation how Hargrove knew he was to be there; he had his suit filed, summons issued and an officer there to serve it when Harmon got off the train. Moreover, the suit was brought in Texas, where Harmon had no property; where

there was no possibility of collecting, when he could have foreclosed his mortgage or lien in Independence County and sold the property to pay the debt. Leonard, Robertson and Harmon were brothers-in-law. Leonard sold his property to Harmon, his brother-in-law, received no cash, but received notes secured by the property, and then, instead of making any effort to sell the notes to persons in Arkansas, who knew about the value of the securities, took his notes, together with Independence County scrip, to Pittsburg, Texas, and sold to Hargrove for about 60 per cent. of their value, when the property was ample security for the face value of the notes and could have been collected without any difficulty.

The court, after the testimony, entered a decree reciting that W. C. Hargrove had been served with a certified copy of the supplemental complaint; had failed to make any response, and that he had also been served with constructive service as required by law, and that an attorney *ad litem* had been appointed to defend for him. That the defendants, W. A. Harmon and Leona Harmon, had been duly served with summons, and had filed answers, and the court further found that the defendant, T. F. Leonard, converted all his property into liquid assets and took same to Texas, and made a fraudulent disposition of all his notes, accounts and county scrip, including the notes of the defendants, Harmon and Robertson, in an amount of $16,500, selling them for a discount of over 40 per cent. when the same were well secured and worth par value, and that he was later adjudged a bankrupt, and had no property out of which plaintiff's judgment could be made, except the notes of defendant.

The court further found that W. C. Hargrove participated in the fraudulent sale of said notes and scrip and bought the property at a grossly inadequate price, under such circumstances as would not constitute him an innocent purchaser or a *bona fide* holder for value. The court further found that Harmon and Robertson went to Texas and suffered themselves sued there by W. C. Hargrove,

acting in collusion with the defendants, Leonard and Hargrove, for the purpose of defeating plaintiff in the collection of his judgment. And the court also found that the sale by Leonard to Hargrove of his entire assets was fraudulent and made for the purpose of defeating plaintiff in the collection of his judgment. And the court further found that there was sufficient assets turned over to Hargrove by Leonard to pay him $9,500, the amount he claimed to have paid for the same, and to pay plaintiff's judgment, with interest and costs. That Hargrove has disposed of some of the property, but still has $9,000, and the court further found that there was sufficient due from Hargrove to defendant, Harmon, over and above the judgment and costs, to pay Hargrove more than the full amount that he claimed to have paid.

In addition to what the court recited in its decree, it may be said that the proof shows that Hargrove still, according to his own testimony, owes Leonard considerably more than enough to pay appellee's judgment, and, in fact, Hargrove has a judgment in the Texas court for something over $9,000 against Leonard, so that Leonard still owes more than $9,000.

It is unnecessary to set out the evidence. After a careful examination of all the evidence in the case, we are of the opinion that the finding of the chancellor was sustained by a preponderance of the evidence.

Appellant argues that this court has held that inadequacy of price is not sufficient to justify the court in holding that the conveyance was fraudulent, and that is true. That would not necessarily constitute bad faith, but the inadequacy of price, together with all the circumstances indicating fraud in this case, seem to us to justify the finding of the chancellor that the sale was fraudulent, and that Hargrove participated in the fraud.

Appellant contends that fraud must be proved, and will never be presumed, and in this he is correct. The fraud must be proved, but we think it has not only been proved in this case, but the facts proved are inconsistent with any proper motive. Good faith is the basis of all

dealing, and every kind of contract, every transaction for the conveyance of property, may be vitiated by fraud. Of course, an insolvent debtor may sell his property and give good title. He can do so if the transaction is made in good faith, and even inadequacy of price does not necessarily make it fraudulent, but it has many times been held that indebtedness or insolvency at the time of a conveyance creates a *prima facie* presumption of fraud.

It has been said: "Gross disparity between the consideration and the actual value of the property conveyed is a badge of fraud, and this even in the case of an execution sale. Under such circumstances it is generally held that equity will in any event subject the property conveyed to the claims of creditors to the extent that the real value exceeds the consideration, for such a conveyance is partially voluntary. If the disparity of consideration is deliberate, with intent to defraud creditors, the transaction is utterly void as to creditors, and gross disparity may, under some circumstances, of itself justify the inference that there was actual fraud, especially where the disparity is occasioned not by the absence, but by the illegality of the consideration. * * * The court will not weigh the value of the goods sold and the price received in very nice scales, but, all circumstances considered, there should be a reasonable and fair proportion between the one and the other." 12 R. C. L. 478.

In this case Hargrove purchased the property for approximately $7,000 less than its value, when the notes were secured by property that could be sold for a sum sufficient to pay the entire debt.

It is unnecessary to review or discuss the authorities cited by the parties, since we have reached the conclusion that the chancellor's finding that the conveyance was fraudulent is supported by a preponderance of the evidence, and we have reached the conclusion that the decree of the chancellor is correct, and it is affirmed.