**BANK OF SUN PRAIRIE, a Wisconsin Banking Corporation, Plaintiff,**

**v.**

**A. Kenneth HOVIG and Vanassa G. Hovig, Husband and Wife, Leland E. Seba and Dixie Lee Seba, Husband and Wife, and Alpine, Inc., an Arkansas Corporation, Defendants.**

**Civ. A. No. 873.**

United States District Court
W. D. Arkansas,
Hot Springs Division.

June 18, 1963.

C. Floyd Huff, Jr., Hot Springs, Ark., for plaintiff.

Michael B. Heindl, Hot Springs, Ark., for Hovigs.

Sigun Rasmussen, Hot Springs, Ark., for Seba and Alpine, Inc.

JOHN E. MILLER, Chief Judge.

This is an action by the plaintiff to set aside an alleged fraudulent conveyance by Mr. and Mrs. Hovig, defendants, of certain lands, together with furniture, furnishings, and fixtures located thereon, to the defendant, Leland E. Seba as Trustee, and the conveyance by Seba individually and as Trustee, and Dixie Lee Seba, individually, of the same land to the defendant, Alpine, Inc.

In their answers and amended answers the defendants denied that the conveyances in question were without consideration or were a fraudulent transfer of property on their part, and in the alternative alleged that since the property in question is exempt as a rural homestead pursuant to the provisions of the Arkansas Constitution of 1874, that it was legally impossible for Mr. and Mrs. Hovig to commit a fraud by the conveyance of their homestead to the defendant, Leland E. Seba, as Trustee.

The case was tried to the court on April 23, 1963, and upon completion of the presentation of all the evidence, the case was submitted and taken under advisement by the court. Since that date the parties have submitted briefs in support of their respective contentions.

In an effort to clarify the issues, it seems advisable to set forth a chronologic statement of the events and property transactions which have a direct bearing on the decision of the issues.

On March 19, 1959, Mr. and Mrs. Hovig, together with Mr. and Mrs. Driggers, as partners, purchased a parcel of land situated on the shore of Lake Hamilton in Garland County, Arkansas, upon which were located a combination office and residence and furnished units used in the operation of a motel. The land in question was purchased from Mr. and Mrs. Cranfill, who, in consideration for the payment of $6,000.00 cash and the execution of a promissory note in the sum of $34,000.00, executed a warranty deed filed for record March 20, 1959, and recorded in Deed Record Book 646 at page 129 of the records of deeds and mortgages of Garland County, Arkansas, in which appears the following description of the land in question:

Part of the SE¼ NE¼ of Section 29, Township 3 South, Range 19 West, Garland County, Arkansas more particularly described as follows: Beginning at the Southwest corner of the said SE¼ NE¼ of Section 29; thence East along the South line of said SE¼ NE¼ for a distance of 445.2 feet; thence North 14 degrees 30 minutes West for a distance of 415.9 feet to a point on the South side of a road, said point being the Northwest corner of the Harrelson Tract as recorded in Book 457, page 277, of the Records of Deeds and Mortgages of Garland County, Arkansas; thence North for a distance of 30 feet to a point on the North side of said road, said point being on the South line of the Maxwell tract as recorded in Book 442, Page 63 of said Record, and being 54.1 feet West of the Southwest corner of the John Park tract as recorded in Book 345, Page 29 and in Book 377, Page 475 of said Record; thence West along the North side of said road and the South line of said Maxwell tract for a distance of 316.9 feet to the Southwest corner of said Maxwell tract; thence North along the West line of said Maxwell tract and the East side of a road for a distance of 86.8 feet to the Northwest corner of said Maxwell tract; thence West for a distance of 40 feet to the West line of said SE¼ NE¼ on the West side of said road; thence South along the West line of said SE¼ NE¼ for a distance of 530 feet to place of beginning.

ALSO Lot 93 of Lakeland Subdivision of part of Section 29, Township 3 South, Range 19 West, Garland County, Arkansas.

ALSO Part of Lot 94 of Lakeland Subdivision of part of Section 29, Township 3 South, Range 19 West, Garland County, Arkansas, more par-

ticularly described as follows: Beginning at the common corner of Lots 93 and 94 on the North side of said Lots 93 and 94 in said Lakeland Subdivision; thence South 82 degrees 30 minutes East for a distance of 103.4 feet; thence South 48 degrees West for a distance of 66 feet to the shoreline of Lake Hamilton at elevation of 395 feet above mean sea level; thence Northwesterly along said contour elevation of 395 feet above mean sea level for a distance of 48 feet to the dividing line between said Lots 93 and 94; thence Northwesterly along the dividing line between said Lots 93 and 94 for a distance of 48 feet to the place of beginning.

On September 30, 1959, Mr. and Mrs. Driggers, by warranty deed, conveyed to Mr. and Mrs. Hovig all of their interest in the land in question subject to the mortgage held by Mr. and Mrs. Cranfill, said deed being recorded on October 13, 1959, in Deed Record Book 473 at page 689 in Garland County, Arkansas.

On November 10, 1959, Mr. and Mrs. Hovig, by warranty deed, conveyed an undivided one-half interest in the above described land to Mr. and Mrs. Hart for a consideration of $10,000.00 evidenced by a note secured by a mortgage dated November 10, 1959, which represented a purchase of a partnership interest by the Harts. The deed and the mortgage were recorded on November 30, 1959, in Deed Record Book 475 at pages 649–650, respectively, in Garland County, Arkansas. This indebtedness on the part of the Harts was subsequently paid, as evidenced by a release deed dated December 20, 1960, filed for record on January 2, 1961, and recorded in Deed Record Book 492 at page 106 in Garland County, Arkansas.

During the period from March 1959, Mr. and Mrs. Hovig commuted back and forth between their residence in Hot Springs and their residence in Sun Prairie, Wisconsin, where they had formerly lived full-time and where Mr. Hovig was engaged in constructing a number of residential units in Sun Prairie. Some-

time later in 1960, Mr. Hovig's building project in Sun Prairie encountered financial difficulties and became enmeshed in litigation. On September 26, 1960, Mr. and Mrs. Hovig, having returned to Arkansas, took over the active management and control of the land in question, now known as the Alpine Courts, and on said date moved on the property and occupied the residence thereon with the intention of making it their permanent home.

On October 18, 1960, a judgment was entered in the Circuit Court of Dane County, Wisconsin, in favor of the plaintiff in the instant case, Bank of Sun Prairie, and against the defendants, Mr. and Mrs. Hovig, in the total sum of $20,266.93, which judgment was based upon a loan of $19,000.00 at 6 percent interest from the plaintiff bank. This loan was secured by stock in a Wisconsin corporation of a par value of $30,000.00.

On December 30, 1960, the defendant, A. Kenneth Hovig, conveyed his interest in the land, fixtures, etc., in question to Leland E. Seba as Trustee by a warranty deed for good and valuable consideration, and the assumption by Seba as Trustee of indebtedness specified in a memorandum agreement entered into by the same parties on December 29, 1960, which indebtedness owed by the partnership of Hovigs and the Harts amounted to approximately $61,500.00. Also, on the same date, Leland Seba, for valuable consideration, agreed to sell to Mr. and Mrs. Hovig 39 percent of the interest or any portion thereof in the real and personal property in question for $3,900.00, which option was not assignable and was to be exercised within a period of 24 months from December 29, 1960. The deed was recorded on January 2, 1961, in Book 492 at page 111 of the records of deeds and mortgages of Garland County, Arkansas.

On December 31, 1960, Vanassa G. Hovig executed a warranty deed of the same land, fixtures, etc., to Leland E. Seba, Trustee, which was based on the same consideration as the deed executed by her husband to Seba. This deed was recorded on January 2, 1961, in Deed

Record Book 492 at page 114 in Garland County, Arkansas.

On December 31, 1960, Mr. and Mrs. Hart executed a warranty deed which conveyed their undivided one-half interest in the lands, fixtures, etc., to Leland E. Seba, the consideration for which Seba was to assume indebtedness as specified in the memorandum agreement between Mr. and Mrs. Hovig and Mr. Seba dated December 29, 1960, as well as the payment of $13,500.00 in cash to Mr. and Mrs. Hart.

On April 8, 1961, the defendants, Leland E. Seba, individually and as Trustee, and his wife individually, by quitclaim deed conveyed all their interest in the above described lands, fixtures, etc., to the defendant, Alpine, Inc., an Arkansas corporation, which deed was filed for record on October 13, 1961. The defendant, Alpine, Inc., was incorporated on April 3, 1961, the incorporators being Leland E. Seba, A. Kenneth Hovig and Dixie Lee Seba.

The lands, fixtures, furnishings and furniture in question were subject to liens held by the following individuals or corporations on December 31, 1960, all of which were superior and prior to that of the plaintiff, to-wit: J. A. and Helen Cranfill, approximately $31,000.00 secured by a first mortgage; First Federal Savings and Loan Association of Hot Springs, Arkansas, approximately $2,500.00 secured by a second mortgage; Holiday Homes, Inc., approximately $9,500.00 secured by a third mortgage; National Theater Supply, approximately $13,400.00; Universal C.I.T., approximately $2,700.00; and the Arkansas First National Bank, approximately $900.00, the total of which amounts to $60,000.00. These liens were either secured by the real or the personal property above described in their entirety and not primarily by the one-half interest of the defendants, Mr. and Mrs. Hovig.

On August 16, 1961, the plaintiff filed an action in the Hot Springs Division of this court, under the style of Bank of Sun Prairie v. A. Kenneth Hovig and Vanassa G. Hovig, Civil Action No. 861, to obtain a judgment on the judgment previously rendered in the State of Wisconsin on October 18, 1960. The cause was set for trial on October 25, 1961, at which time the defendant, Vanassa G. Hovig, appeared with counsel and consented that judgment be entered against her upon the Wisconsin judgment, which was accordingly entered in favor of the plaintiff in the sum of $20,266.93, plus costs and interests. The defendant, A. Kenneth Hovig, was ill and unable to attend court at that time, and later on November 29, 1961, judgment was formally entered against him for the same amount.

■ The plaintiff in its complaint contends that it had acquired a lien on the interest of the defendants Hovig on December 12, 1960, by filing and recording in the Office of the Circuit Clerk of Garland County, Arkansas, an exemplified copy of the judgment which it had obtained in the Circuit Court of Dane County, Wisconsin, against the defendants Hovig on October 13, 1960. However, this court is of the opinion that the filing of the Wisconsin judgment in the Office of the Circuit Clerk of Garland County, Arkansas, amounted to nothing more than a notice to the defendants Hovig and any prospective grantees, such as the defendant Seba, that the plaintiff had obtained a judgment in the State of Wisconsin against the defendants Hovig and that it was in the process of enforcing the Wisconsin judgment against them. A judgment lien was not acquired by the plaintiff against the defendants Hovig until judgment was entered by this court in Civil Action No. 861, on October 25, 1961, against Mrs. Hovig, and on November 29, 1961, against Mr. Hovig. See, Ark.Stat.Ann., Secs. 29–801, 29–817, 29–130 (1962 Repl.); Tolley v. Wilson, 212 Ark. 163, 205 S.W. 2d 177; Fears v. Futrell, 216 Ark. 122, 224 S.W.2d 362; Leflar, Conflict of Laws, (1959) Sec. 80, page 151.

The main issue to be determined by the court is whether the various conveyances of the property in question between the Hovigs and the Sebas and the Sebas and

Alpine, Inc., were fraudulent as to creditors in general and the plaintiff as a judgment creditor in particular.

The case of Sieb's Hatcheries, Inc. v. Lindley, D.C., 111 F.Supp. 705, involving a voluntary conveyance, which was decided by this court in 1953, contains the following statement concerning the law applicable to a case of this nature:

"A great many cases involving alleged fraudulent conveyances of both personal and real property have been before the Arkansas Supreme Court. The principles of law are singularly uniform and consistent, and in such cases the application of the law to the facts presents the only difficulty."

Ark.Stat.Ann., Sec. 68–1302 (1957 Repl.), provides:

"Every conveyance or assignment, in writing or otherwise, of any estate or interest in lands, or in goods and chattels, or things in action * * * and every bond, suit, judgment, decree or execution, made or contrived *with the intent to hinder, delay or defraud creditors or other persons of their lawful actions, damages, forfeitures, debts or demands, as against creditors and purchasers prior and subsequent, shall be void.*" (Emphasis added.)

■ The court in Evans v. Cheatham, 183 Ark. 82, at page 85, 34 S.W.2d 1076, at page 1077, in commenting on the statute approved the rule that was announced in 12 R.C.L. 537, (now contained in 24 Am.Jur., Fraudulent Conveyances, Sec. 12), with the following statement:

"While the general rule is that a fraudulent intent on the part of the grantor is necessary to bring conveyances within the terms of the statutes, it is well settled that fraud may arise as an inference of law, and that, when a conveyance is made under such circumstances that the result must necessarily be to hinder and delay creditors, it will be presumed that such was the intent of the transferor in making it."

■■ The burden of proof on a party alleging fraudulent intent on the part of the grantor is stated in the case of Harris v. Shaw, (1954) 224 Ark. 150, at page 154, 272 S.W.2d 53, at page 55 as follows:

"* * * It is true that in suits of this kind fraud is never presumed but must be affirmatively proved by a clear preponderance of the evidence by the party who alleges and relies on it. United States Ozone Co. v. Morrilton Ice Co., 186 Ark. 485, 54 S.W.2d 282. We have also held that while fraud may be established by circumstantial evidence, the circumstances must be so strong and well connected as to clearly show fraud. Du Fresne v. Paul, 144 Ark. 87, 221 S.W. 485; Stringer v. Georgia State Savings Association of Savannah, 218 Ark. 683, 238 S.W.2d 629."

■■ The case of Wright v. Aaron, (1948) 214 Ark. 254, 215 S.W.2d 725, holds as a general proposition that the intent which makes a conveyance fraudulent as to creditors must be participated in by both parties, that is, the grantor and the grantee, and states the rules of law pertaining to the role of the purchaser of fraudulently conveyed property, beginning at page 257 of 214 Ark., at page 726 of 215 S.W.2d as follows:

"1. Aaron's Purchase. The applicable rules of law in a case such as this one, were stated by Mr. Justice Walker in Galbreath v. Cook, 30 Ark. 417:

" 'It may be considered as settled in this court, that when a party purchases property and pays for it a fair price, and without knowledge of the failing circumstances of the debtor, or of his intent to defraud his creditors, he will be protected in his purchase. Splawn v. Martin, 17 Ark. 146, 152, and Christian v. Greenwood, 23 Ark. 258, 266, 79 Am. Dec. 104.

\*     \*     \*     \*     \*     \*

" 'But if the purchaser has notice of the fraud and deals with the vendor, and by so doing aids him in the perpetration of a fraud upon his creditors, then, even if a full price is paid by him, he can assert no claim to equitable relief, * * *

\* \* \* \* \*

" 'Thus we see that in order to protect the purchaser in his property, it is not alone necessary that he should be an innocent purchaser, but that he should also have paid a consideration for the property. These combined protect him; if either is wanting he must fail.' "

■ The plaintiff contends that at the time the conveyances attacked herein were made, it was an existing creditor of the defendants Hovig and that the above rules of law should be applied to the facts in this case. On the other hand, the defendants Hovig and Seba contend that at the time the conveyances were made, with particular reference to the conveyance from Mr. and Mrs. Hovig to Seba as Trustee, that none of them entertained any fraudulent intent. In deciding this general issue, there are certain indicia of fraudulent intent which the courts have generally accepted. The Supreme Court of Arkansas in the case of Harris v. Shaw, supra, at page 154 of 224 Ark., at page 55 of 272 S.W.2d, has set out these indicia in the following statement:

"There are certain circumstances which so frequently attend conveyances or transfers to defraud creditors that they are recognized as badges or indicia of fraud. 37 C. J.S., Fraudulent Conveyances, § 79. One of the most important of these is the insolvency or indebtedness of the transferrer. Others are inadequate or fictitious consideration, retention by the debtor of the property, the pendency or threat of litigation, secrecy or concealment, and the fact that the disputed transactions were conducted in a manner differing from the usual business practice. 24 Am.Jur., Fraudulent Conveyanc-

es, Secs. 14 and 17; Moore on Fraudulent Conveyances, Vol. 1, p. 222; Godfrey v. Herring, 74 Ark. 186, 85 S.W. 232; Fromholtz v. Trimble, 140 Ark. 282, 215 S.W. 623; Harmon v. McSpadden, 174 Ark. 184, 295 S.W. 353. In our opinion the facts and circumstances in this case clearly established the concurrence of all these indicia and afford a sound basis for the court's decree."

It is the purpose of this court to pattern its discussion of the facts in such a manner as to discuss them in light of each of the above quoted badges or indicia of fraud individually.

■■ As stated above, the most important factor to be considered is the insolvency or indebtedness of the grantor; or, stated in a different fashion, was the grantor insolvent or merely in debt to a number of creditors? The evidence shows that in Arkansas the bulk of Hovig's indebtedness was to secured creditors which indebtedness was assumed by Seba at the time Hovig conveyed his undivided one-half interest in the land, fixtures, etc., on December 30, 1960. The plaintiff did not introduce any evidence of any other Arkansas indebtedness which, when added to the indebtedness assumed by Seba, would exceed Hovig's assets and make him insolvent. As for Hovig's indebtedness in Wisconsin, the evidence shows that besides the approximately $20,000.00 owed the plaintiff, his building project was saddled with an indebtedness in the neighborhood of $180,-000.00. However, the evidence introduced showed that although the property in Wisconsin had been tied up due to litigation, its market value exceeded the indebtedness by approximately $46,000.00. Also, in this connection the evidence showed that at the time Hovig became indebted to the plaintiff, he pledged to it security in the form of 300 shares of a Wisconsin corporation, said stock being of a par value of $100.00 per share. The plaintiff did not introduce any evidence concerning the present value of the shares, or of any other assets of the Hovigs in Wisconsin. Therefore, the

facts are clear that under a definition of insolvency as a lack of means to pay one's debts, or as such a relative condition of a man's assets and liabilities that the former, if made immediately available, would not be sufficient to discharge the later, then by any conventional standard it would appear that Hovig was solvent at the time of the transaction in question. In this connection, the law as stated by the Arkansas Supreme Court has made it clear that before a presumption of fraud on the part of the grantor may be found, there must be a clear distinction made between actual insolvency and mere indebtedness on his part. In the early case of Dardenne v. Hardwick, (1849) 9 Ark. 482, the court at page 484 affirmed an instruction given by the trial court, which stated that a man may sell his property, real and personal, no matter how much he is indebted and that the mere circumstances of indebtedness is no evidence of fraud.

Since that decision there have been many more decisions which have been in accord with the above statement of law. In the later case of Moore v. Brasel, (1934) 188 Ark. 550, 66 S.W.2d 1068, which involved a voluntary conveyance or a gift to a relative, the court made the following statement beginning at page 552 of 188 Ark., at page 1069 of 66 S.W. 2d:

> "* * * The intent to defraud subsequent creditors is not made to appear merely because of outstanding liabilities against the grantor—these liabilities must be shown to have been in excess of all property retained by him. The chancellor found, from the testimony, that James Brasel was solvent at the time the gift was made to his wife and we think this finding is supported by the testimony."

In the case of Sieb's Hatcheries, Inc. v. Lindley, supra, this court made the following statement at page 715 of 111 F.Supp.:

> "Before a creditor can complain of a conveyance by a debtor, he

must show that he was injured by such a conveyance. In Mente & Co., Inc., v. Westbrook, 181 Ark. 96, at page 102, 24 S.W.2d 976, at page 978, the Court said:

> " 'It is also well settled that, to entitle a creditor to set aside a conveyance as fraudulent, it is necessary, not only that there be fraud on the part of the vendor participated in by the vendee, but also that there be an injury to the person complaining. The creditor who seeks to set aside a conveyance as fraudulent must show that his debtor has disposed of property that might otherwise have been subjected to the satisfaction of his debt.' "

In the instant case the plaintiff has failed to prove by a preponderance of the evidence that it suffered any injury due to the conveyance of the property in question by the Hovigs to Seba as Trustee. As stated above, the loan from the plaintiff to the Hovigs, amounting to approximately $19,000.00, was secured by 300 shares of stock with a total par value of $30,000.00. The plaintiff has not introduced any evidence as to the failure of the original security. Furthermore, since the plaintiff has failed to prove insolvency on the part of the Hovigs at the time of the transaction in question, the court cannot assume that there were insufficient nonexempt assets in Wisconsin which the plaintiff was able to attach in order to satisfy the judgment entered against the Hovigs on their debt to the plaintiff.

The next point to be considered as an indicia of fraud was whether the consideration paid by Seba was so grossly inadequate or fictitious as to make the conveyance between Seba and the Hovigs fraudulent. As heretofore stated, the facts are clear that Seba as Trustee assumed secured indebtedness of the land, fixtures, etc., amounting to approximately $60,000.00, as well as paying $2,700.00 to Hovig in cash to satisfy open accounts, and $13,500.00 to the Harts for their undivided one-half interest in the lands in question, as consideration for the con-

veyance by the Hovigs and the Harts of their undivided one-half interests to Seba. Thus, the total of this consideration paid by Seba would amount to approximately $76,200.00. In addition, Seba granted a two-year option to Hovig which allowed him to repurchase a 39 percent interest in the business and property on payment of $3,900.00. At the time of the conveyance estimates of value of the property, fixtures, etc., ranged from $60,000.00 to $110,000.00; thus, the value of Hovig's option, depending upon the evaluation of the property and business would range from approximately $19,500.00 to approximately $39,000.00. When the value of the option is added to $76,200.00, the consideration paid by Seba would appear to be fair and valuable in view of all the circumstances surrounding the transaction.

The general rule concerning inadequacy of consideration is stated in the case of Harmon v. McSpadden, (1927) 174 Ark. 184, at page 190, 295 S.W. 353, at page 355, as follows:

"It has been said: 'Gross disparity between the consideration and the actual value of the property conveyed is a badge of fraud, and this even in the case of an execution sale. Under such circumstances it is generally held that equity will in any event subject the property conveyed to the claims of creditors to the extent that the real value exceeds the consideration, for such a conveyance is partially voluntary. If the disparity of consideration is deliberate, with intent to defraud creditors, the transaction is utterly void as to creditors, and gross disparity may under some circumstances of itself justify the inference that there was actual fraud, especially where the disparity is occasioned not by the absence, but by the illegality of the consideration. * * * The courts will not weigh the value of the goods sold and the price received in very nice scales, but all circumstances considered, there should be a reasonable

and fair proportion between the one and the other.' 12 R.C.L. 478."

See, also, Ramey-Milburn Co. v. Sevick, (1923) 159 Ark. 358, 252 S.W. 20.

In determining whether the consideration is adequate or inadequate, or, if inadequate, whether it is grossly inadequate, the rule as stated in the case of Carpenter v. Walker, (1940) 199 Ark. 829, 138 S.W.2d 68, incidentally holds that the conveyance by a debtor to a third party of mortgaged property is supported by adequate consideration if the third party grantee agrees to pay the debts owed by the grantor and which are secured by the property.

Turning to the facts in the instant case, the evidence shows conclusively that with the exception of the $13,500.00 paid to Mr. and Mrs. Hart for their undivided one-half interest in the lands, fixtures, etc., in question, and the $2,700.00 paid to Mr. and Mrs. Hovig to satisfy the open accounts due, the bulk of the consideration amounting to approximately $60,000.00 was due creditors, the payment of which was either secured by the lands, fixtures, furniture or furnishings and which the evidence shows Seba and his successor, Alpine, Inc., have paid and the liens have been released. The evidence has further shown that the total of this consideration, plus the addition of the value of the two-year option to repurchase given by Seba to Mr. and Mrs. Hovig equaled the estimated evaluation of the lands and fixtures as of December 31, 1960. Therefore, in view of the rules heretofore stated, the consideration as a matter of law appears to be adequate, and if there is any disparity at all between consideration and value received by Seba as Trustee, it is slight and far from being "grossly inadequate."

Another recognized indicia of fraud attending a conveyance of property is the pendency or threat of litigation against the grantor or its seller which is known by the grantee or buyer. In the instant case Seba had knowledge, constructive or otherwise, that the Bank of Sun Prai-

rie had obtained a judgment in Wisconsin against Mr. and Mrs. Hovig and that they were seeking to enforce it in Arkansas. However, the evidence shows the following circumstances: that Seba and the Hovigs sought to satisfy this judgment in their memorandum of agreement made and entered into on December 29, 1960, in which it was provided that as a condition precedent to the sale of the lands, fixtures, etc., in question, that the Hovigs would secure a release of the plaintiff's judgment against them; that the Hovigs sought to assign their option to repurchase to the plaintiff in exchange for a release which the plaintiff refused; that Seba, through a competent appraiser, investigated the extent of the Hovigs' assets and liabilities in Wisconsin and found the assets to exceed the liabilities in an amount at least twice that of the amount of plaintiff's judgment; and that Seba was unable to determine any litigation or pendency of litigation to collect any further judgments in either Arkansas or Wisconsin other than the judgment involving the present case and the litigation connected with their building project in Wisconsin in general.

The general rule is that intent to defraud or knowledge that the vendor has committed fraud on the part of the purchaser may be established by the fact of pendency of litigation, and this circumstance may be properly considered by the trier of facts in determining the issue as to whether the purchaser bought with notice. Yet, this knowledge on the part of the purchaser does not of itself establish a fraudulent intent on his part, and the adverse evidentiary effect thereof may be overcome by proof that the purchaser acted in good faith paying a valuable consideration, etc. 24 Am.Jur., Fraudulent Conveyances, Sec. 15.

Turning to the facts in the instant case, the evidence has shown conclusively that although Seba, as purchaser, had notice of the pendency of litigation by the plaintiff to enforce the Wisconsin judgment against Hovig, yet this indicia of fraudulent intent has been overcome by the lack of insolvency on the part of Hovig and the payment of adequate consideration for the lands, fixtures, etc.

Another indicia of fraudulent intent is the conduct of the disputed transaction in a manner differing from the usual business practice. An example of such a transaction may be that of voluntary conveyance or a conveyance between members of a family for little or no consideration. This is not the case insofar as the transaction in question is concerned, for the Hovigs and Seba dealt at arm's length, the transaction was supported by adequate consideration, and their only relationship was that of business acquaintances. Other characteristics that would surround an unusual business practice would include the secrecy or concealment of the transaction and retention of the property by the vendor or grantor. In the instant case the conveyances were duly recorded, and the only retention of the property by the Hovigs was their reservation of an option to repurchase which extended more than a period of two years. The fact that Mr. and Mrs. Hovig have remained on the premises as managers of the tourist accommodations on the land in question does not affect the transaction for the reason that their position could be terminated by their employer, Alpine, Inc., at any time.

Alpine, Inc., has been made a party defendant as the ultimate grantee of the lands, fixtures, etc., in question under a conveyance by Seba as Trustee and Mrs. Seba; but due to the fact that the circumstances surrounding the original conveyance by the Hovigs to Seba as Trustee were innocent and not fraudulent, it is the opinion of the court that the succeeding transfer of the lands, fixtures, etc., in question is not subject to attack by plaintiff.

Therefore, in view of the facts as found by the court and the applicable law, as heretofore stated, it is the conclusion of the court that the property in question was not conveyed by Mr. and

Mrs. Hovig to Seba as Trustee, and Seba as Trustee and his wife to Alpine, Inc., with the intent to hinder, delay or defraud plaintiff as creditor of the Hovigs. Rather, it is the opinion of the court that these conveyances of the property in question were valid and should not be voided under the provisions of Ark.Stat. Ann., Sec. 68–1302 (1957 Repl.), as heretofore quoted.

This conclusion also makes it unnecessary for the court to consider the intervention of Clyde B. McNeill filed October 15, 1962, or the motion of the plaintiff filed October 17, 1962, to strike said intervention.

Although the court is convinced that plaintiff's action should be dismissed for the reason that it has failed to prove by a preponderance of the evidence that the conveyances of the property in question among the defendants were made with the intent to defraud the plaintiff as a creditor the court deems it worthwhile to explore the alternative issues raised by the defendants in their claims that the property in question was exempt under the homestead provisions of the Arkansas Constitution of 1874, since the case was tried on all of the issues.

This alternative issue of homestead will be considered in two parts: first, whether the property in question was the homestead of Mr. and Mrs. Hovig as of December 30, 1960, the date they conveyed the property in question to Seba as Trustee; and, second, assuming that Mr. and Mrs. Hovig had a homestead interest in the property in question, whether the interest should be held to be a rural or urban homestead as provided by the Arkansas Constitution of 1874.

The homestead exemption from legal process in general is provided for in the Arkansas Constitution of 1874, Article 9, Section 3, which states that the homestead of any resident of Arkansas who is married shall not be subject to the lien of any judgment or to sale under execution or other process except as such may be rendered for certain specified debts.

The plaintiff does not dispute the fact that the defendant, A. Kenneth Hovig, was married at the time he occupied the property in question, or that the judgment awarded the plaintiff in Wisconsin was upon anything other than a debt by contract, thus not included within any of the exceptions set forth in Article 9, Section 3. Therefore, the question as to whether or not the defendants acquired a homestead at all in Arkansas on the property in question revolves around the date upon which they became residents of Arkansas as specified in Article 9, Section 3. The defendants contend that they became residents of Arkansas on September 26, 1960; however, the plaintiff contends that the defendants did not attain such residentiary status in the state until some later date in 1961 subsequent to the conveyances from them to Seba as Trustee of the lands in question, which were recorded on January 2, 1961.

The law in Arkansas governing the elements necessary for the acquisition of a homestead and the burden of proof to be borne by the one claiming a homestead exemption is set forth in the case of Chastain v. Arkansas Bank & Trust Co., (1923) 157 Ark. 423, beginning at page 428, 249 S.W. 1, at page 2:

"There can be no such thing as the fraudulent acquisition of a homestead, for the law permits it, regardless of the rights of creditors. Ferguson v. Little Rock Trust Co., 99 Ark. 45, 137 S.W. 555. It is quite another thing, however, to say that a given tract or lot of real estate must be occupied in good faith as a home before it becomes impressed with the character of a homestead under the law. This court has steadily adhered to the rule that actual occupancy in good faith is essential to the impressment of the homestead character. A mere intention to occupy as a homestead in the future is not sufficient. Williams v. Dorris, 31 Ark. 466; Patrick v. Baxter, 42 Ark. 175; Tillar v. Bass, 57 Ark.

179, 21 S.W. 34; Gill v. Gill, 69 Ark. 596, 65 S.W. 112, 55 L.R.A. 191; Gibbs v. Adams, 76 Ark. 575, 89 S.W. 1008; Gebhart v. Merchant, 84 Ark. 359, 105 S.W. 1034.

"The good faith of the occupancy may be inquired into for the purpose, not of determining whether the occupant is entitled to impress the property as a homestead, but of determining whether the occupancy was to actually establish a home. Gibbs v. Adams, supra; Kulbeth v. Drew County Timber Co., 125 Ark. 291, 188 S.W. 810.

"The facts of the case must therefore be examined in the light of these decisions for the purpose of determining whether they are sufficient to show that the property in controversy was actually occupied in good faith as a home by appellants for the purpose of impressing it with the homestead character. The burden of proof is on them to show that there was such occupancy as was sufficient to establish the homestead. Pace v. Robbins, 67 Ark. 232, 54 S.W. 213; Gibbs v. Adams, supra."

See, also, Hinton v. Willard, (1949) 215 Ark. 204, 220 S.W.2d 423.

The facts as developed in the instant case show that on March 19, 1959, when Mr. and Mrs. Hovig purchased the property in question in partnership with another man, they had only the bare intention to eventually retire in Hot Springs due to the healthful climate and the therapeutic bath facilities it offered. Their activities at the time were equally divided between developing the tourist court upon the Arkansas property and completing a large building project in Sun Prairie, Wisconsin. At that time their residence and domicile was in Wisconsin where they paid taxes and voted. During the following 18 months, the Hovigs, in conjunction with their original partner and a succeeding partner, John R. Hart, enlarged the Alpine Courts by adding a dozen or more rental units to the combination office and residence and the one rental unit which were on the property at the time of the original purchase in March 1959. Sometime during 1960, the construction of the Wisconsin building project came to a halt due to the bankruptcy of Mr. Hovig's general contractor, and the subsequent litigation which arose. Since it was not likely the Wisconsin building project would be completed in the near future and the Hovigs had no other employment or source of income, they decided to move all of their belongings to Hot Springs and take over the active management and control of the tourist courts on the land in question, which would provide them with a place to live, adequate income, and an opportunity to retrench and harbor their resources. The evidence shows conclusively that Mr. and Mrs. Hovig made such a move and took up residence on the land in question on September 26, 1960, with the good-faith intention to occupy the combination office and residence on the tourist court premises on a permanent basis as their home and business. Although they did not expect to retire in Hot Springs at that particular date, the over-all circumstances necessitated such a move, and they were reconciled to the idea of remaining at this location indefinitely. The objective evidence introduced at the trial shows that on September 30 both Mr. and Mrs. Hovig paid their poll tax for the year 1960, which would entitle them to vote at their particular precinct in any election held in Arkansas between October 2, 1960, and October 1, 1961, inclusive. Also, Mr. Hovig purchased a 1961 automobile license tag in Arkansas giving his address as the property in question.

Therefore, it is the opinion of the court insofar as the question of whether Mr. and Mrs. Hovig acquired a homestead at all in Arkansas on September 26, 1960, that they have sustained their burden of proof, and the only question that remains to be considered is the nature and extent of their homestead.

Article 9, Sections 4 and 5, of the Arkansas Constitution controls the na-

ture and extent of a homestead depending on whether it is classified as urban or rural.

Article 9, Section 4, supra, provides:

"The homestead outside any city, town or village, owned and occupied as a residence, shall consist of not exceeding one hundred and sixty acres of land, with the improvements thereon, to be selected by the owner, provided the same shall not exceed in value the sum of twenty-five hundred dollars, and in no event shall the homestead be reduced to less than eighty acres, without regard to value."

Article 9, Section 5, supra, provides:

"The homestead in any city, town or village, owned and occupied as a residence, shall consist of not exceeding one acre of land, with the improvements thereon, to be selected by the owner, provided the same shall not exceed in value the sum of two thousand five hundred dollars, and in no event shall such homestead be reduced to less than one-quarter of an acre of land, without regard to value."

The testimony adduced at the trial was undisputed, and in summary was as follows:

The land in question constitutes an area of approximately five acres, more or less, situated on the shore of Lake Hamilton, a man-made lake near the City of Hot Springs, Arkansas. This land, besides being the residence of Mr. and Mrs. Hovig, is operated as a tourist court or lake resort with 12 or more cabins located on its premises. At the time of its conveyance to Seba as Trustee, the Hovigs owned an undivided one-half interest in the land, fixtures, etc., and the total value of this property was in excess of $2,500.00.

The area or neighborhood in which this land was situated is a large peninsula which extends into Lake Hamilton and is located approximately 2½ miles from the city limits of Hot Springs. Seven subdivisions have been platted in this Lakeland area, the bills of assurance of which have been filed at different times during the period from June 6, 1936, to September 24, 1958. The property occupied by the Hovigs was located on the Lakeland Subdivision, which is the oldest and gives the area in general its name. The other subdivisions have such names as Chambers Point, Clifton Lake, Eastborough Shores, and Sherwood Forest. On these subdivisions there are 124 private residences and 18 businesses, two of which are country-type general stores carrying mostly groceries and fishing tackle. The remaining businesses are made up of resorts or tourist courts, boat landings and trailer courts.

The size of the lots or combinations of lots upon which most of the private residences have been built vary in size from minimum 50' x 150' lots to areas several acres in size. A number of the residences are built on what are called double 50' x 150' lots, or combinations of three or four lots together. The type of people other than tourists residing in this area is evenly divided among those people who are retired, those people who live on the lake and work in and around Hot Springs, and those people who live out of town during the week and drive to Lake Hamilton to spend the week end in houses that are located in this area. A small percentage of the residents are owners and operators of those businesses that are located in the Lakeland area. The one common denominator, however, is the proximity of Lake Hamilton, which represents either recreation or income or both to the residents of this area.

This community, known generally as the Lakeland area, has several characteristics which are urban in nature. The most apparent of these characteristics is the fact that the houses are relatively close together and they are numbered. The streets and roads are paved and they are named. Public utilities which are available to the residents and businesses include gas, electricity and telephone. Regular garbage pickup is available to

those who individually subscribe to such service, which is carried out by a private enterprise.

On the other hand there is a noticeable lack of those urban characteristics which are usually present in all incorporated municipalities, be they villages, towns or cities. Primarily this Lakeland area is neither incorporated as a municipality nor has it any official name. There is no municipal type of government, elective or otherwise, to administer this area. Although the roads and streets are paved, this improvement was brought about by the sharing of the cost of paving between the landowners and the county government, which constructed and now maintains the streets and roads. There is no local fire protection, voluntary or otherwise, nor any police protection other than what is offered through the Sheriff's office. There are no public schools nor public transportation available in this area. There are no sewer systems, public waterworks, street lights, or public sidewalks. There is no "civic center" or "downtown" area, characteristic of an organized community which would include offices for doctors or lawyers, utility companies, businesses such as dry goods stores, banks, service stations, etc. The only two businesses open to the general public other than public boat landings, are two general stores which are approximately two or three blocks apart. There is no local post office, and the mail deliveries are brought out from Hot Springs by mail truck and delivered to road-side boxes in front of the individual residences or businesses. There are no public parks or municipally owned recreation areas

Therefore, the particular question which is presented is whether the real property claimed as exempt by the defendants is rural or urban property within the above-stated provisions of the Arkansas Constitution. If it is rural property, the schedule filed on October 22, 1962, by the defendants as to real property should be allowed and approved. If it is urban property, the schedule should be disapproved and the property subject-

ed to sale on execution with the right of the defendants to select from the property an area not less than one-fourth of an acre with improvements thereon.

In support of its allegation that, assuming there is a homestead in the defendants, it is no more than an urban homestead, the plaintiff contends (1) that the real property has become urban because of the character and use of the property, as well as the character and use of the property in the surrounding area; and (2) that the words "city, town or village," as used in Article 9, Sections 4 and 5, of the Arkansas Constitution are not limited to incorporated communities, and that the area in which this property is located should be held to be an unincorporated village within the constitutional provisions.

In 26 Am.Jur., Homestead, Section 11, the rule to be applied in the consideration of the respective claims of the parties is stated as follows:

"Constitutional or statutory provisions for homesteads are to be construed liberally, with a view to accomplishing their beneficient object and carrying out the purpose of the legislature. That is to say, the construction should be liberal toward the debtor, but strict toward his creditors or one who has dealt with the property. It is said that the courts employ the most liberal and humane rules of interpretation to insure the unfortunate debtor and his equally unfortunate, but more helpless, family the shelter and influence of home. It is asseverated that all reasonable presumptions will be indulged in favor of the homestead right, and that the right is to be held to apply to all such cases as are within the equity and spirit of the statute which has established it."

The fact that the Hovigs operated a tourist court on the same premises where their residence was located would not affect the over-all nature of the property in question. As stated in

the case of Starr v. City National Bank, 159 Ark. 409, 413, 252 S.W. 356, 357:

"One does not lose his homestead for using part of it for business purposes."

■■■■ These particular issues, along with an analogous fact situation, were thoroughly discussed by this court in the case of King v. Sweatt, W.D.Ark. 1953, 115 F.Supp. 215, in which the court made the following analysis, beginning at page 219:

"The mere fact that the property is located approximately one mile from the corporate limits of Hot Springs, the nearest city, town or village, is not conclusive of the nature of the property. Under the constitutional provision heretofore set forth it is not necessary that property be situated within the corporate limits of a city, town or village to be classified as urban property.

"What are the tests to be considered in determining the classification? Whether property occupied by the owner and claimed as a homestead is a rural or urban homestead is to be determined on the facts of each case, and the Court must bear in mind the constitutional or statutory purpose or intent. There does not seem to be any precise legal definition of the terms 'city, town or village' as used in the Constitution of Arkansas defining a homestead, and the Court must presume that the words were used in the Constitution in their popular sense. Murray v. Menefee, 20 Ark. 561. The Legislature of Arkansas has defined the words when used in taxation statutes. Southeast Arkansas Levee District v. Turner, 184 Ark. 1147, 45 S.W.2d 512. In that case the question was whether certain property was situated in the town of McGehee, Arkansas. The residences were all of a permanent and substantial character and the occupants thereof were furnished with gas, water, electric and telephone service from the City of McGehee.

In holding that the area was within the City of McGehee, although not within the corporate limits, the Court on page 1152 of 184 Ark., on page 514 of 45 S.W.2d, said:

" 'We have here a compact community of 42 houses, occupied by persons who may fairly be said to dwell together and who are separated from a city of the second class only by the city's incorporation line and who have all the conveniences which proximity to the city affords and whose property is assessed for general taxation as additions to this city.'

\* \* \* \* \* \*

"In the case of Spaulding v. Haley, 101 Ark. 296, 142 S.W. 172, the Court beginning at the bottom of page 299 of 101 Ark., at page 173 of 142 S.W., said:

" 'We do not think that merely describing land in a deed by lot and block numbers, without actually making a subdivision or filing a plat thereof, necessarily amounts to a separation so as to cut it up into lots and blocks, nor does it determine the character of a homestead, whether urban or rural, though that fact may be considered as a circumstance in determining whether the land is held as an urban or as a rural home. Even platting land into lots, blocks, and streets, and filing a plat with the county clerk, does not constitute such land urban property, unless, in fact, situated within a town or village. Clements v. Crawford County Bank, 64 Ark. 7, 40 S.W. 132.'

"See also, Stuckey v. Horn, supra [132 Ark. 357, 200 S.W. 1025]..

"Generally speaking, the word village always carries to the mind the idea of a small urban community. A city is a town and a village is a town, and ordinarily the word city or village indicates the size of the town. Therefore, the word town seems to be the key word in the Constitutional provisions under consideration.

"In order to be an urban homestead, the property must be situated *'in any city, town or.village,'* and in order to be a rural homestead the property must be situated *'outside any city, town or village'*.

"Here, the property claimed as exempt it situated in a community where there is no post office, school, church or other improvements except filling stations, tourist courts, and one or two 'country stores.' The community does not even have a name. The property is assessed for taxation as any other rural property.

"In Webster's New International Dictionary, Second Edition, the word rural is defined as, 'of or pertaining to the country, as distinguished from a city or town.' The word urban is defined as, 'characteristic of, constituting or pertaining to a city or town.'"

Taking all things into consideration, the only urban characteristic of the so-called Lakeland area is the proximity of a large number of residences, be they year-round, week end only, or temporary for tourists. On the other hand, this proximity has not been brought about by their mutual need to band together and form a self-sustaining community. They have not deemed it necessary to organize any sort of municipal government, much less to incorporate in order to secure protection for their persons or property and to enjoy the large number of amenities offered to organized town dwellers. Rather, the proximity is caused by a combination of their common affinity toward the lake-side way of life and the high cost of lake-side property. In other words, the collection of residences and businesses at this particular location comes under the general classification of a resort area which is not organized along any other lines. This court is not prepared to state at this time that an unorganized resort area may be designated as urban merely because of the proximity of its inhabitants and the high value of the property. Therefore, it is the opinion of the court that the property in question is rural and not urban by its own nature and the nature of the surrounding area within the contemplation of Article 9, Section 4, of the Arkansas Constitution.

An order in accordance with the above is being entered today dismissing the plaintiff's complaint for want of equity.