RALSTON PURINA COMPANY *v.* A. E. DAVIS and Georgene DAVIS, His Wife; J. M. DAVIS and Lila DAVIS, His Wife; and PEOPLES BANK & TRUST COMPANY

74-58                                             511 S.W. 2d 482

Opinion delivered July 15, 1974

*W. H. Schulze*, for appellant.

*Williams & Gardner* and *Wright, Lindsey & Jennings* by *David M. Powell*, for appellees.

J. FRED JONES. Justice. This is an appeal by Ralston Purina Company from an adverse decree of the Pope County Chancery Court in a suit filed by Ralston against A. E. Davis, et al., to set aside a conveyance of 400 acres of farmland from J. M. Davis to his son and daughter-in-law, A. E. Davis and Georgene Davis, as a fraud on creditors. On appeal to this court Ralston contends that the chancellor's finding that Ralston had not sustained its burden of proof was against the clear preponderance of the evidence. We are of the opinion that the chancellor's finding was not clearly against the preponderance of the evidence.

J. M., or Monroe, Davis and his wife Lila owned 480 acres of land in Pope County which they used in connection with cattle production, with a part of the land being devoted first to turkey raising and then to hen egg production. They were assisted in these operations by their married son Jerry Davis who appears to have been a partner in the operation. Another son, Dr. A. E. Davis, was a doctor of veterinary medicine and owned adjacent land to his father's land. The

three Davises, for convenience and identification, will hereafter be referred to as Monroe, Jerry and Dr. A.E. Davis, and Ralston Purina Company will be referred to as Ralston.

Monroe and his son Jerry had over a period of years raised turkeys, produced hen eggs and hauled feed under contracts with Ralston. In 1967 a difficulty arose between Ralston and the Davises resulting in a suit in 1968 by the Davises against Ralston for breach of contract, and a counterclaim by Ralston for debt on account. The Davises obtained judgment against Ralston for $45,349.96 and Ralston obtained judgment against Monroe Davis for $163,-142.42 on its counterclaim. The judgments were affirmed by opinion of this court on June 2, 1970, in *Davis* v. *Ralston Purina*, 248 Ark. 1128, 455 S.W. 2d 685.

Notwithstanding their past differences and the amount owed by the Davises on the 1967 account, in early 1968 the Davises obtained 90,000 laying chickens from Ralston under a contract whereby Ralston agreed to extend credit to the Davises for chicken feed and supplies. In February, 1968, the Davises owed Ralston $187,500.25 and Ralston refused further credit to the Davises. On March 15, 1968, Monroe and his wife conveyed 400 acres of their 480 acre tract to their son Dr. A. E. Davis and his wife Georgene for a consideration of $30,000. Two bank mortgages on the land totaling $17,-884.59 were paid out of the sale price and approximately $10,000 was paid to Monroe in cash.

On May 21, 1969, execution was issued on Ralston's judgment against Monroe which, after set-off, amounted to $117,792.85. The execution was returned wholly unsatisfied, whereupon Ralston brought the present action to set aside the transfer of the 400 acres to Dr. A. E. Davis and his wife as a fraud on creditors.

Ralston argues that the transfer was made or contrived with the intent to hinder, delay or defraud Ralston as a creditor and is, therefore, void under Ark. Stat. Ann. § 68-1302 (Repl. 1957) which reads as follows:

"Every conveyance or assignment, in writing or otherwise, of any estate or interest in lands, or in goods

and chattels, or things in action, or of any rents issuing therefrom, and every charge upon lands, goods or things in action, or upon the rents and profits thereof, and every bond, suit, judgment, decree or execution, made or contrived with the intent to hinder, delay or defraud creditors or other persons of their lawful actions, damages, forfeitures, debts or demands, as against creditors and purchasers prior and subsequent, shall be void."

Ralston has cited several of our prior decisions bearing on fraudulent intent and rules as to the nature and sufficiency of evidence necessary to set aside deeds of conveyance as fraud upon creditors. Fraudulent intent is, of course, necessary to bring the conveyance within the terms of the statute and conveyances made to members of the household or near relatives of a financially embarrassed debtor are looked upon with suspicion and scrutinized with care. When such conveyances are made to members of a household or near relatives without consideration, or with only token consideration, the transfer is presumed to be fraudulent as to existing creditors. See 12 R.C.L. 537; 37 Am. Jur. 2d, Fraudulent Conveyances, § 23; *Wilks v. Vaughn*, 73 Ark. 174, 83 S.W. 913; *Harmon v. McSpadden*, 174 Ark. 184, 295 S.W. 353.

In *Harris v. Shaw*, 224 Ark. 150, 272 S.W. 2d 53, we set out certain indicia of fraudulent intent which may give rise to an inference that a conveyance has been made with the intent to hinder, delay or defraud creditors, and in that case we said:

"There are certain circumstances which so frequently attend conveyances or transfers to defraud creditors that they are recognized as badges or indicia of fraud. 37 C.J.S., Fraudulent Conveyances, § 79. One of the most important of these is the insolvency or indebtedness of the transferrer. Others are inadequate or fictitious consideration, retention by the debtor of the property, the pendency or threat of litigation, secrecy or concealment, and the fact that the disputed transactions were conducted in a manner differing from the usual business practice. 24 Am. Jur., Fraudulent Conveyances, §§ 14 and 17."

The deed of conveyance from Monroe and his wife Lila to Dr. A. E. Davis and Georgene Davis was dated March 13, 1968. The judgment for $117,792.85 was rendered against Monroe Davis on April 18, 1969. It was filed for record on April 21 and execution was issued on October 27, 1970. Under date of December 3, 1970, Monroe filed a schedule claiming his 80 acre homestead as a part of his constitutional exemptions from civil execution; so, the question comes down to whether the transfer was fraudulent under the facts in this case, and whether Ralston sustained its burden of proving that the transfer from Monroe Davis and Lila Davis to Dr. A. E. Davis and his wife Georgene was done with the intent to defraud or delay creditors, specifically the Ralston Purina Company.

The only direct testimony offered by Ralston was the testimony of its credit manager Mr. Davis Sorenson. He testified that Mr. and Mrs. Monroe Davis and Jerry Davis had an open account with Ralston and as of March 13, 1968, it amounted to $120,822.75. He said that in addition to the open account, as of March 13, 1968, the Davises owed a balance on seven promissory notes in the total amount of $66,678.50 and the notes were introduced into evidence. One of the notes was dated February 13, 1968, in the original amount of $30,940 and was payable on demand; another was dated January 9, 1967, in the original amount of $16,742.25. It bore eight per cent interest after maturity and was to be paid as follows:

"At all egg proceeds over 20¢ (twenty cents) per dozen. The egg proceeds will be applied first to the interest and then to principal. Interest will be charged at the rate of 7% (seven per cent) before maturity."

The other notes were also to be paid from egg proceeds. Three of them were dated January 9, 1967, in the original amounts of $33,623.03, $21,258.08 and $21,623.92 respectively. Another note in the amount of $23,018.10 was dated June 7, 1967, and another was dated January 9, 1967, for $13,-512.83. Mr. Sorenson said that nothing had been paid on the indebtedness and nothing had been paid on the judgment.

On cross-examination Mr. Sorenson testified that he

started working for Ralston in 1968 and had no direct information concerning the dealings with the Davises. He said that in March, 1968, the Davises owed Ralston $187,000 and between March 13, 1968, and October 31, 1968, the indebtedness was reduced by approximately $35,000. He said the laying hens were sold in connection with the replevin action brought by Ralston and their sale price partially accounted for the difference in the amount owed.

The amount of indebtedness is not questioned in this case and Mr. Sorenson's testimony had little bearing on the question of fraud in connection with the conveyance from Monroe to Dr. A. E. Davis. Ralston relies most heavily on the presumptions attending sales by financially embarrassed debtors to members of their household or near relatives.

Monroe and Dr. Davis testified in defense of their transaction, but we deem it unnecessary to set out their testimony in detail. The substance of Dr. Davis' testimony was to the effect that he owned 240 acres of land adjacent and contiguous to the 480 acres owned by his parents. He was aware in a general way, of some of the difficulties Monroe was having with Ralston. In February, 1968, Monroe had 90,000 laying chickens on hand which had not reached productive, or laying, age when Ralston discontinued credit to Monroe. In March Dr. Davis purchased 400 acres of Monroe's land for a total consideration of $30,000. Two bank mortgages were satisfied out of this amount and approximately $10,000 was paid to Monroe in cash. Monroe was then on a cash basis in buying feed from Ralston and he used the $10,000 cash for feed in bringing the poultry flock into egg production. In July, 1968, Monroe was having additional difficulty with Ralston over poor quality of eggs Monroe attributed to feed and Ralston attributed to other causes. According to Dr. A. E. Davis, he organized Dega Poultry Company, Inc. in the latter part of July, 1968. Dega owned considerable assets, including flocks of laying hens, throughout Pope County by October, 1968, when Ralston repossessed in replevin Monroe's laying flock which was sold at public sale and the proceeds applied on Monroe's indebtedness. Dega Poultry purchased the laying flock from the purchaser at the public sale. Dega also purchased repossessed equipment from Monroe's creditors and continued or carried on the egg

production business in buildings it leased from Monroe. Dr. Davis testified in part as follows:

"Q. I believe the replevin action was in October of 1968?

A. Yes, sir.

Q. You've testified, Mr. Davis, that you purchased this land because you own land adjacent to it and wanted some other land?

A. Yes.

Q. Uh . . was it ever discussed with you or did you ever have any knowledge of the fact that there was a possibility that your father would have a judgment rendered against him by Ralston Purina Company?

A. Oh, Good Lord no, not at that time. There was no . . . there was no litigation at that time and of course, my father's only interest at that time was staying in the poultry business.

Q. There was disagreement at that time, though, wasn't there?

A. Yes.

Q. And had been for about six months previous to that between your father and Ralston Purina?

A. Yes, there was disagreement because Ralston Purina would not furnish the hens which they had promised to do.

Q. He felt like he had been mistreated by Ralston Purina?

A. Well I am sure he did.

Q. And you were aware of this problem when you purchased the land?

A. Yes."

Mr. Monroe Davis testified that in the spring of 1968 he had 90,000 birds which Ralston had promised to finance. He said the birds were 14 weeks old when Ralston requested additional security in the form of a mortgage on his real property and when he refused, Ralston refused to finance his operation any further. He said when he refused to give additional mortgages to Ralston, he already had his land mortgaged to banks. He said he sold the land involved to his son in March, 1968, and that at that time he was in debt to Ralston in a substantial amount. He said that dealing in poultry, however, on the scale and to the extent he was involved, constituted a substantial operation. He then testified as follows:

"Q. O.K. So then in March you sold this land to your son and you took the money and cleared that land and the land you had left?

A. Also took some of this money and put it right back into this business because Ralston Purina had agreed to finance the birds and they wouldn't do it, and I had them 18 weeks old and they had cut off and I had to have money.

Q. They had already cut your credit off when you had this transaction?

A. In February.

Q. In February before you sold this land to your son in March?

A. Yes.

Q. So in 1968 you ah made a transaction which cleared your homestead and also cleared you with certain of your other creditors?

A. Yes, sir.

Q. All right, now you continued to operate your poultry business?

A. Yes, sir.

Q. And in the summer of 1968 you had additional problems, feed problems?

A. Yes, sir, in July I believe.

Q. As a result of these problems, you had . . . you sought legal advice and sent some of these hens off to be tested?

A. Yes, sir."

Mr. Monroe Davis testified that after Ralston stopped extending him credit in February and after he sold his land to his son in March, he paid off some mortgages on the land and continued to pay cash for feed. He said that he continued to purchase feed from Ralston but was having trouble with the Ralston feed in connection with light colored egg yolks. He said that Ralston was contending that his difficulty was caused by worms and that it was his contention that the difficulty was caused by the feed. He said he did not go out of the poultry business as an individual until his birds were replevied in October, 1968. He said that following this date he went to work for his son around the first of January, 1969, and has been employed by Dega Poultry Company ever since. He said that he would have been able to pay his indebtedness to Ralston if it had not replevied his chickens and forced him out of business.

Mr. Monroe Davis testified that the debt he owed to Ralston increased when he purchased the hens. He said he went to the credit manager for Ralston and asked about furnishing the birds and that nothing was said about security other than a mortgage on the birds. He said that Ralston furnished him 90,000 birds and agreed to finance them at $1.40 per bird. In this connection he testified as follows:

"A. The birds were to be financed at a dollar forty cents a bird. There were to go to the bank and get the money and turn it over to us and we were to grow the birds and they were to pay the dollar and forty cents at the end of six months, which they did not do.

Q. How many birds did you put down?

A. Put down 90,000.

Q. When did Ralston Purina cut your credit off?

A. In February of 1968.

Q. And why at that point . . . how old were your hens?

A. They were averaging about 18 weeks of age.

Q. And how much did it cost to feed those hens at that time?

A. It cost a nickel a bird a week.

* * *

A. It costs four thousand five hundred dollars a week to feed those 90,000 birds a week.

Q. Four thousand five hundred dollars a week. How old do the hens have to be before production begins?

A. Approximately 25 to 26 weeks.

Q. Why did you sell your land to your son?

A. I needed the money.

Q. In addition to that land, did you sell other assets?

A. Yes.

Q. What happened to the money you obtained from the sale of the land and the other assets?

A. We put those birds into production.

Q. In March of 1968 had Ralston Purina ever threatened to sue you?

A. No, sir.

Q. Had they ever made demand on you to pay the ac-

count that you owed them at that time?

A. No, sir.

Q. They simply put you on a cash basis for feed, is that correct?

A. Right.

Q. In March of 1968 were you paying your debts as they accrued to others?

A. Yes, sir.

Q. After March of 1968 did you make payments to Ralston Purina?

A. Yes, sir.

Q. Did you reduce the indebtedness?

A. Yes, sir. We took every check we got and went by their office. They took what they were supposed to have and give us what we were supposed to have.

Q. And this continued up until the time the hens were repossessed is that correct?

A. Right."

In connection with Monroe's testimony as to market value of his land, the record appears as follows:

"BY THE COURT: And in 1968 wasn't $75.00 an acre a little low for 400 acres of land lying together out there?

BY MR. DAVIS: In 1968 it was altogether different from what it is now. Land wasn't selling too good in 1968. I can show you land all around it that sold for less than $30.00 or around $30.00 an acre. Fact the business, Mr. Ike Laws [Ralston's attorney] bought some right close to it for about $30.00.

BY MR. LAWS: $87.00 an acre was what I paid for it."

Under continued questioning by the court Mr. Davis continued as follows:

"Q. What improvements are on this land?

A. Not any.

Q. Not any at all?

A. No, sir, not any on the land he bought.

Q. I'm talking about the 400 acres that Al bought.

A. Not any.

Q. On the 400 acres that Mr. Al Davis bought were there any improvements, houses, etc.?

A. No, sir.

Q. No houses. What was it used for? Or what could it have been used for?

A. Pasture land.

Q. Was it under fence?

A. Part of it was. Part of it wasn't.

Q. What about timber, had it been cut over?

A. Timber land . . . I sold the timber off it. . . I sold the pine timber off of it for approximately $4,000.00. The rest of the timber was just scrub timber.

Q. So that was vacant land without any houses or improvements?

A. Yes, sir.

Q. It wasn't being used in your egg business?

A. It just held the world together. . . part of it.

Q. Now this check for $10,211.40 which was the cash part of this transaction?

A. Yes, sir, I got that.

Q. That's the money you put into the business, is that right?

A. I got the oh—money and put the money in my business. And I spent it getting these hens ready for production, so that I could pay the debt.

Q. I see that Mr. Barger handled that transaction for you from the looks on the back of it?

A. Yes, sir.

Q. Used part of it to pay off your home place?

A. Yes, sir.I had to pay it off because it was mortgaged together with the other land."

It is obvious from the record before us, that raising laying hens for the production of eggs, as well as raising turkeys, on the scale in which Monroe Davis was involved is a large scale operation requiring a substantial amount of money to stay in business. It is clear from the evidence that Monroe was only using a small portion of his 480 acres of land in connection with his poultry business. It is apparent from the record that notwithstanding the fact he owed Ralston a substantial amount in connection with the production of turkeys in 1967, he made arrangements with Ralston whereby Ralston furnished to him 90,000 young birds for the purpose and with the intent that they would be raised by Davis and used as laying hens for the commercial production of eggs. It is clear from the record of Mr. Davis' uncontradicted testimony that Ralston agreed to finance Davis in connection with the laying flock to the extent of $1.40 per bird, but that Ralston put Davis on a cash basis before the birds had reached production age but while they were still consuming $4,500

worth of feed per week. It is apparent from the record that it was at this point Mr. Davis sold his land for $30,000 with approximately $10,000 of the purchase price paid in cash which he used in purchasing chicken feed (primarily from Ralston) in putting his birds into production.

Even after the birds were in full production, the record indicates that Mr. Davis continued to purchase his feed from Ralston and the question arose as to whether the Ralston feed or something else was causing the poor quality or grade of the eggs being produced. This argument apparently resulted in Ralston replevying the hens under a procedure whereby they were sold at public auction.

The evidence of record indicates that Dr. A. E. Davis was to some extent in competition with Ralston, in that his corporation was furnishing laying flocks to farmers scattered all over Pope County; and the 90,000 hens as well as the equipment originally purchased on credit by Monroe Davis, and subsequently purchased by Dr. Davis or Dega Poultry, constituted only part of the Dr. Davis and Dega Poultry assets and operation. There is no question that Dr. Davis actually gave $30,000 value for the 400 acres involved. The highest market value even alleged as to the 400 acres was $46,000, or approximately $115 per acre. The evidence as to the actual market value of the land here involved as well as adjacent lands, ranges from slightly more than $30 per acre for the 80 acres purchased in 1966, to $70.85 per acre for the 240 acres purchased in 1964, and $87.50 per acre recently purchased in the vicinity by one of the attorneys in this case. Dr. Davis paid $75.00 per acre for the 400 acres he purchased from his parents.

We are unable to say that the chancellor's finding and decree are against the preponderance of the evidence in this case, so the decree of the chancellor is affirmed.