A/S KREDITT–FINANS

v.

**CIA VENETICO DE NAVEGACION S.A. OF PANAMA and Johs. Presthus and Arne Presthus, doing business as Presthus Chartering A/S, Johs. Presthus Rederi, and Arne Presthus Rederi A/S.**

Civ. A. No. 79–612 (Misc.).

United States District Court,
E.D. Pennsylvania.

March 31, 1983.

Alfred E. Yudes, Jr., Palmer Biezup & Henderson, Philadelphia, Pa., Terry L. Stoltz, Burlingham, Underwood & Lord, New York City, for plaintiff.

Robert B. White, Jr., Rawle & Henderson, James D. Crawford, Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., for defendants.

## OPINION

LOUIS H. POLLAK, District Judge.

The matter to be determined is a motion filed by plaintiff A/S Kreditt-Finans ("Kreditt-Finans") and certain intervenors— Norges Skibshypotek A/S, Bergen Bank International S/A (Luxembourg) and Storebrand—for summary judgment against defendant Cia Venetico de Navegacion S.A. of Panama ("Cia Venetico").

In its primary aspect, the motion for summary judgment seeks an order disallowing claims made by Cia Venetico against a vessel of Norwegian registry, the ANNA PRESTHUS, "arrested" by Cia Venetico in Philadelphia on September 29, 1979. The purpose of the arrest was to enforce a consent judgment in the amount of $675,000, filed in the United States District Court for the Southern District of New York on April 9, 1979. That judgment was in favor of Cia Venetico and against several Norwegian individuals and enterprises, one of which, Arne Presthus Rederi A/S, was on the date of the judgment the registered owner of the ANNA PRESTHUS. However, on September 28, 1979, the day before the arrest of the ANNA PRESTHUS, title to the ship

was transferred from Arne Presthus Rederi A/S to Kreditt-Finans. Wherefore, on October 1, 1979, Kreditt-Finans initiated this suit to get an adjudication confirming its title. On October 22, 1979, this court granted a motion to intervene filed four days before by Norges Skibshypotek, Bergen Bank and Storebrand; the three intervenors, holders of mortgages on the ANNA PRESTHUS, entered the suit to protect their secured creditor status against Cia Venetico's claim.

In opposition to the motion for summary judgment, Cia Venetico contends that the transfer of title to the ANNA PRESTHUS on September 28, 1979, one day before the vessel's arrest, was a fraudulent conveyance. The movants, in turn, challenge Cia Venetico's standing to question the validity of the conveyance, arguing that there was no remaining equity in the heavily mortgaged vessel at the time it was conveyed. To resolve these contentions, it will be necessary to canvass in some detail the events, summarized above, which have precipitated this suit.[1]

## I.

In March 1977 an arbitration panel in New York awarded $1,302,070.35 to Cia Venetico against Presthus Chartering A/S, a Norwegian corporation, for wrongful repudiation of a charter. In June 1977, Cia Venetico filed a complaint in the United States District Court for the Southern District of New York against Johs. Presthus and Arne Presthus, Norwegian citizens, and Arne Presthus Rederi A/S, Johs. Presthus Rederi and Presthus Chartering A/S to enforce the arbitration award. On April 9, 1979 an agreement settling that suit was entered in the Southern District of New York as a consent judgment for $675,000 against all defendants except Arne Presthus. The first installment payment under that judgment was due on June 1, 1979, but was never received by Cia Venetico. *See* Affidavit of Terry Stoltz ("Stoltz Affidavit") ¶ 31 (Nov. 12, 1982).

Cia Venetico then sued in Norway to enforce the consent judgment. While waiting for a decision in that case, Cia Venetico learned that the ANNA PRESTHUS was scheduled to arrive in New York on September 15, 1979. Armed with this knowledge, Cia Venetico demanded from Arne Presthus Rederi A/S ("Rederi") payment of the full amount of the consent judgment. Rederi tendered nothing.[2] Thereupon, Cia Venetico on September 14, 1979 obtained a writ of execution on the ANNA PRESTHUS in the Southern District of New York. The Presthus defendants were notified of the court's action.

The ANNA PRESTHUS did not arrive in New York as scheduled; instead, it went to Bermuda. While the ship was in Bermuda, Cia Venetico negotiated with the parties holding mortgages[3] on the vessel in an "attempt to settle the matter in a manner which would eliminate the necessity of levying under the Judgment." Stoltz Affidavit ¶ 36. These attempts proved unsuccessful, and the vessel was arrested by Cia Venetico on September 29, 1979, after its arrival in Philadelphia. One of the mortgagees, however, aware of the imminent arrest, had arranged for Rederi to transfer title to the vessel to Kreditt-Finans on September 28,

---

1. A secondary target of the motion for summary judgment is a counterclaim filed by Cia Venetico alleging, as Cia Venetico has put it in one of its memoranda of law, that Kreditt-Finans and the intervenors were part of a "conspiracy to defraud Cia Venetico and the courts of Norway and the United States." For the disposition of this counterclaim see *infra* note 16.

2. Cia Venetico did receive a message from Rederi that "none of our companies are today in financial position to pay"; Cia Venetico rejected the offer of a mortgage on the vessel in lieu of cash payment. Stoltz Affidavit ¶ 34.

3. Prior to its arrest, the vessel was encumbered by seven mortgages held by three mortgagees. The affidavit of Oyvind Holte of August 17, 1982 ("Holte Affidavit I"), submitted in support of the motion for summary judgment, describes these mortgages. Holte Affidavit I at ¶¶ 1, 2; *see infra* note 5. Cia Venetico classifies and describes these mortgages differently. *See infra* note 6. Cia Venetico does agree, however, that when the ANNA PRESTHUS left Bermuda it was encumbered by seven mortgages held by three mortgagees. Stoltz Affidavit ¶ 37.

1979. Kreditt-Finans assumed liability on $5,227,000.00 of the mortgage debt, and Rederi remained liable for the remainder.

On October 1, 1979, two days after the arrest, Kreditt-Finans filed a property claim in this court asserting its ownership of the ANNA PRESTHUS, thus preventing the United States Marshal from selling the vessel at auction. On October 18, 1979, the mortgagees of the ANNA PRESTHUS sought to intervene in order to protect their interests in the event of a forced sale and to recover damages from Cia Venetico should maritime liens superior to their mortgages attach during the period of arrest. At a conference on October 22, I granted the motion to intervene.

On November 2, on the motion of Kreditt-Finans and the intervenors, I ordered the release of the ANNA PRESTHUS upon the filing with the court of a letter of credit in the amount of $1,350,000.[4] Kreditt-Finans and the intervenors now seek summary judgment on Cia Venetico's claim arising out of the arrest of the ANNA PRESTHUS and on Cia Venetico's counterclaim against Kreditt-Finans and the intervenors based on their alleged involvement in a conspiracy to transfer without fair consideration two other ships owned by Rederi to a company owned by one of the intervenors. (The single cause of action not embraced by the motion for summary judgment is the claim by Kreditt-Finans and the intervenors that the arrest of the ANNA PRESTHUS was an abuse of process; this claim is considered in part III of this Opinion.)

## II.

In moving for summary judgment, Kreditt-Finans and the intervenors ("Kreditt-Finans" or "intervenors") dispute Cia Venetico's standing to contend that the September 28, 1979 transfer of title to the ANNA PRESTHUS from Rederi to Kreditt-Finans was a fraudulent conveyance. They contend that (1) proof of injury is an essential element in a fraudulent conveyance action, and (2) because Rederi had no equity in the vessel on that date, the transfer of title could not have injured Cia Venetico.

According to Kreditt-Finans, this absence of equity is demonstrated by a comparison between the fair market value of the vessel and its total mortgage debt.[5] On the date of transfer, Kreditt-Finans contends, the total mortgage debt ($6,688,059.84) substantially exceeded the vessel's fair market value (between $4,750,000 and 5,000,000). See supra note 5; Holte Affidavit I at ¶¶ 5–8. Cia Venetico does not challenge Kreditt-Finans' estimate of the vessel's fair market value. However, Cia Venetico does challenge both the validity of the mortgages and the amount of mortgage debt outstanding at the time the title was transferred.[6]

4. In late October 1979, Rederi initiated bankruptcy proceedings in the Norwegian courts.

5. The affidavit of Oyvind Holte of August 17, 1982 asserts that on September 28, 1979, seven mortgages were registered on the ANNA PRESTHUS:
  1. First mortgage to Norges Skibshypotek A/S ("Norges") in the amount of $2,350,000 (plus ten percent).
  2. Second mortgage to Bergen Bank A/S ("Bergen Bank") in the amount of $2,196,400 (plus ten percent).
  3. Third mortgage to Bergen Bank in the amount of $307,500.
  4. Fourth mortgage to Bergen Bank in the amount of $410,000 (plus ten percent).
  5. Fifth mortgage to Storebrand in the amount of $512,500 (plus ten percent).
  6. Sixth mortgage to Storebrand in the amount of $615,000 (plus ten percent).
  7. Seventh mortgage to Bergen Bank in the amount of $323,000 (plus ten percent).

The Holte Affidavit goes on to state that an appraisal of the ANNA PRESTHUS on September 27, 1979, estimated its fair market value to be between $4,750,000 and $5,000,000. See Holte Affidavit I at ¶¶ 1–5.

6. Cia Venetico does not dispute the existence or the amount of the first mortgage. See supra note 5; Holte Affidavit I at ¶ 1. With respect to the third mortgage, it contends that the amount of debt was $302,852. With respect to the fifth mortgage, it contends that the amount of debt was $264,136. Cia Venetico Memorandum at 18. These three debts are described by Cia Venetico as the "actual mature debts secured by the mortgages and owed by Arne Presthus Rederi" on September 26, 1979—the day the ANNA PRESTHUS left Bermuda for Philadelphia. Id.

With respect to the remaining mortgages, Cia Venetico acknowledges that certain transfers of funds occurred; however, it disagrees with

Kreditt-Finans contends that Norwegian law governs the validity of the mortgages. Cia Venetico asserts that the "validity and priority" of the mortgages are governed by the Ship Mortgage Act of 1920, 46 U.S.C. §§ 911–984. The Ship Mortgage Act, however, provides no substantive standards for determining the validity of a mortgage. *Bergren v. Davis,* 287 F.Supp. 52, 55 (D.Conn.1968) (looking to the law of the vessel's home port, where the mortgage was executed and recorded, to determine the mortgage's validity). *Payne v. SS Tropic Breeze,* 423 F.2d 236, 239 (1st Cir.), *cert. denied,* 400 U.S. 964, 91 S.Ct. 363, 27 L.Ed.2d 383 (1970), cited by Cia Venetico, is not to the contrary; the court there noted that the Ship Mortgage Act "establishes the relative *priorities* of foreign ship mortgages and other maritime liens." (Emphasis added.) The concern in this case, however, is with the validity, not the priority, of the mortgages on the ANNA PRESTHUS. Because these are Norwegian mortgages held by Norwegian mortgagees on a Norwegian vessel, Norwegian law governs their validity. *Bergren v. Davis,* 287 F.Supp. at 55.[7]

The mortgages were recorded long before the events of September 1979, presumably in the ordinary course of business, by banks in whose interest it was to ensure compliance with Norwegian law. Oyvind Holte, an officer of one of those banks, has sworn in his affidavits [8] to that compliance. His first affidavit asserts that "[a]ll of the mortgages were given for value and properly recorded under Norwegian law." Holte Affidavit I at ¶ 3. His second affidavit reiterates that the mortgages were "duly and validly executed under Norwegian law and duly registered in accord with that law of the Ship Registery [sic] in the Port of Bergen, Norway." Holte Affidavit II at ¶ 9.

In determining an issue under foreign law, the court "may consider any relevant material or source ... whether or not ... admissible under the Federal Rules of Evidence." Fed.R.Civ.P. 44.1. *See* E. Scoles & P. Hay, *Conflict of Laws* 410–11 (1982); C. Wright & A. Miller, *Federal Practice and Procedure* § 2444 (1971 & Supp.1982). Although Mr. Holte is not a lawyer, his professional position makes him competent to testify to the validity of a Norwegian mortgage. Moreover, in response to the Holte

Kreditt-Finans about the validity of those transfers. *See infra* text accompanying note 10. First, Cia Venetico admits that on January 21, 1974, Bergen Bank registered a mortgage on the ANNA PRESTHUS. This mortgage was security for a guarantee by Bergen Bank to Security Pacific National Bank ("Security Pacific") which had loaned money to Arne Presthus Rederi to facilitate the purchase of the vessel. Stoltz Affidavit ¶ 3. Cia Venetico acknowledges that on September 27, 1979, Bergen Bank paid to Security Pacific $1,598,850 under this guarantee. Cia Venetico Memorandum at 19. Second, Cia Venetico acknowledges that on April 30, 1975, Bergen Bank guaranteed a loan from Scandinavian Bank Ltd. to Arne Presthus Rederi. The security for this guarantee was the mortgages on the ANNA PRESTHUS. Stoltz Affidavit ¶¶ 6, 7. On September 27, 1979 Bergen Bank paid to Bergen Bank-Luxembourg $342,380 under this guarantee. Cia Venetico Memorandum at 19. Finally, Cia Venetico acknowledges that in September 1975 Arne Presthus Rederi assumed the obligations of Johs. Presthus Rederi under two loans from Scandinavian Bank Ltd. and also obtained an additional loan from that bank. These loans were guaranteed by Bergen Bank, Stoltz Affidavit ¶ 6, which on September 28, 1979 paid to Bergen Bank-Luxembourg a total of $936,700 under the guarantees.

Plaintiff and the intervenors, who contend that the mortgage debt on the vessel should be measured as of September 28, 1979, argue that the amount of the mortgages on that date was at least $6,714,000 and that the outstanding debt under those mortgages was $6,688,059.84. *See supra* note 5; Holte Affidavit I at ¶¶ 3, 4. Defendant, who contends that the debt should be measured as of September 26, 1979, argues that the "mature debt" on that date was only $2,916,987.26. However, defendant admits that the "mature debts allegedly secured by the mortgages" on September 28, 1979 totalled $5,794,917.26.

7. It is notable that at one point the Act defines "preferred mortgage" to include a foreign ship mortgage that "has been duly and validly executed in accordance with the laws of the foreign nation under the laws of which the vessel is documented and has been duly registered in accordance with such laws...." 46 U.S.C. § 951.

8. Holte Affidavit I of August 17, 1982 and Holte Affidavit II of December 20, 1982.

Affidavits and the exhibits supporting them,[9] Cia Venetico has set forth nothing more than vague assertions that all or some of the mortgages may be invalid by reason of lack of consideration, may be invalid by reason of lack of good faith, or may be voidable as fraudulent conveyances. These allegations are speculative and lack the support of any specific facts. Accordingly, they are insufficient to demonstrate the existence of a genuine issue of material fact with respect to the validity of the mortgages.

In addition to challenging the validity of the mortgages themselves, Cia Venetico challenges the propriety of the September 27 and 28 transfers of funds under three of the mortgages. Bergen Bank took those mortgages on the ANNA PRESTHUS in 1974 and 1975 as security for guaranteeing Rederi's obligations to other banks. *See supra* note 6. Although the face amount of these mortgages constituted part of the outstanding debt on the ANNA PRES-THUS, funds were not advanced under the guarantees until September 27 and 28, 1979, at which time Bergen Bank paid to Security Pacific and to Bergen Bank-Luxembourg a total of $2,877,930 under the guarantees. *See supra* note 6; Stoltz Affidavit ¶¶ 6, 7. Cia Venetico argues that Bergen Bank may have made these payments "voluntarily" in an effort to divest Rederi of its equity in the ANNA PRESTHUS. The second Holte Affidavit, however, declares that the pay-

ments by Bergen Bank were obligatory.[10] Unsubstantiated and speculative allegations do not suffice to demonstrate the existence of an issue of fact against the affidavit of Bergen Bank's assistant general manager.

Rederi, therefore, had no equity in the ANNA PRESTHUS on September 28, 1979 —the date the vessel's title was transferred to Kreditt-Finans—because the mortgage debt ($6,688,059.84) exceeded the fair market value (between $4,750,000 and $5,000,-000). The question is whether, in view of this lack of equity, the transfer of title was fraudulent.

▬ Before one can address that substantive question, it is necessary to determine a choice-of-law question: which jurisdiction's corpus of fraudulent conveyance law governs this aspect of this litigation? There are two possible contenders: One is Pennsylvania, the forum and the place where the ANNA PRESTHUS was arrested. The other is New York, the situs of the consent judgment which Cia Venetico seeks to enforce. As between these two, it is apparent that Pennsylvania's interest is accidental and New York's is substantial.[11] Accordingly, it is New York's fraudulent conveyance law which determines whether Rederi's transfer of title in the heavily encumbered ANNA PRESTHUS to Kreditt-Finans is open to challenge by Cia Venetico.[12]

9. E.g., promissory notes executed by Rederi.

10. On September 27 and 28, 1979, promissory notes of Arne Presthus Rederi A/S guaranteed by Bergen Bank became due. Arne Presthus Rederi A/S had previously made interest payments and renegotiated the notes, but Cia Venetico's action of September 21, 1979—attaching the bank accounts of Johs. Presthus Rederi, which operated the Arne Presthus Rederi A/S vessels, thus leaving Arne Presthus Rederi A/S without operating funds—had made further interest payment and renegotiation impossible. Bergen Bank therefore was required to pay under its guarantees. Holte Affidavit II at ¶¶ 5, 6; *see* exhibits A, B, C, D (promissory notes of Arne Presthus Rederi A/S).

11. To be sure, there are other geographic strands in this record. For example, Panama is the formal home of Cia Venetico, as Norway is of Kreditt-Finans and of the intervenors. But

neither of these connections is relevant to the fraudulent conveyance question—a question which in effect seeks to define the effective scope of a New York judgment. By contrast, the Norway connection is decisive with respect to the validity of the mortgages, discussed *supra* at text accompanying note 7.

12. Because the judgment in question, albeit a "New York" judgment, was filed in a United States District Court, I conclude that the choice-of-law question—to which jurisdiction's fraudulent conveyance law should the court look?—is a *federal* question. (*Cf.* the determination, pursuant to the federal Ship Mortgage Act, that *Norwegian* substantive law governs the question of the validity of the mortgages. Text, *supra,* at note 7.) But if I am wrong in this, I conclude nonetheless that a Pennsylvania court would, as a matter of Pennsylvania choice of law, look to the fraudulent convey-

New York has adopted the Uniform Fraudulent Conveyance Act.[13] Its version of the UFCA, which contains some minimal changes from the uniform act not relevant here, is codified at N.Y.Debt. & Cred.Law §§ 270–281 (McKinney 1945 & Supp.1982).

Section 278 is identical to section 9 of the UFCA, which sets forth the rights of creditors whose claims have matured. The statute speaks of a conveyance that is "fraudulent *as to a creditor* [emphasis added]." Kreditt-Finans argues that this language requires a creditor to prove that it was injured by a particular conveyance before seeking the remedies set forth in section 9. Kreditt-Finans contends that because Cia Venetico could not have looked to the ANNA PRESTHUS as a source of payment, it could not possibly have been injured by the transfer and therefore cannot seek to set aside or disregard the conveyance.

██ The New York courts, like courts in other jurisdictions, have seldom used the explicit "proof of injury" language in cases under the UFCA. Perhaps, as Kreditt-Finans has pointed out, this is because creditors ordinarily do not seek to invalidate transactions that cause them no injury and accordingly the question arises only infrequently. However, at least one New York appellate court has held that under the UFCA "creditors have causes of action only to the extent to which they have been damaged." *Buckley Petroleum Products, Inc. v. Goldman,* 28 A.D.2d 640, 641, 280 N.Y.S.2d 876, 878 (1967).[14] *See Suffolk & Nassau Amusement Co. v. Ambrose,* 145 N.Y.S.2d 424 (N.Y.Sup.Ct.1955) (holding that a plaintiff who has not sustained any damage as the result of a transfer of property cannot seek to set that transfer aside as fraudulent). Moreover, numerous courts in other jurisdictions in which the issue has arisen have stated as though it were axiomatic the requirement that a creditor be injured by the conveyance it seeks to invalidate.[15]

I conclude, therefore, that New York appellate courts faced with this question would continue to deny to uninjured parties standing to challenge conveyances as fraudulent. Accordingly, in an order to be entered today, the motion of Kreditt-Finans

ance law of New York on the ground that New York has the "most significant relationship" to this aspect of the litigation. *Griffith v. United Airlines,* 416 Pa. 1, 203 A.2d 796 (1964).

13. So, indeed, has Pennsylvania. In short, even if, contrary to my holding, proper choice of law analysis would yield the conclusion that Pennsylvania rather than New York fraudulent conveyance law governs this aspect of the case, it appears probable that the applicable Pennsylvania rule would coincide with the New York rule discussed in the text.

14. This doctrine is consistent with the New York rule permitting an injured creditor to set a conveyance aside only to the extent necessary to satisfy his own claim. The injured creditor may not act for the benefit of other creditors by setting the conveyance aside completely and subjecting the excess to the claims of others. *See In re Swan-Finch Oil Corp.,* 279 F.Supp. 386 (S.D.N.Y.1967); *Buckley Petroleum Products, Inc. v. Goldman,* 28 A.D.2d 640, 280 N.Y.S.2d 876 (1967); *Gruenebaum v. Lissauer,* 185 Misc. 718, 57 N.Y.S.2d 137 (1945), *aff'd,* 270 A.D. 836, 61 N.Y.S.2d 372 (1946).

15. *See, e.g., Brill v. W.B. Foshay Co.,* 65 F.2d 420 (8th Cir.), *cert. denied,* 290 U.S. 643, 54 S.Ct. 61, 78 L.Ed. 558 (1933); *Bank of Sun Prairie v. Hovig,* 218 F.Supp. 769 (W.D.Ark. 1963); *Haskins v. Certified Escrow & Mortgage Co.,* 96 Cal.App.2d 688, 216 P.2d 90 (1950); *Marsh v. Galbraith,* 31 Tenn.App. 482, 216 S.W.2d 968 (1948); *Davis v. Nielson,* 9 Wash. App. 864, 515 P.2d 995 (1973); *Kopf v. Engelke,* 240 Wis. 10, 1 N.W.2d 760 (1942). *See also Webb v. Webb,* 260 Ala. 426, 70 So.2d 639 (1954); *Lehr v. Moll,* 247 S.W.2d 686 (Mo. 1952).

The New York Appellate Division has noted the importance of a uniform national interpretation of the UFCA:

Because business throughout this country largely disregards State lines, the purpose of a uniform law on fraudulent conveyances was to enable lenders to know with certainty that they could rely upon the property of their debtors, though situated in another State [citation omitted]. Accordingly, in construing a provision of the Uniform Act we should, whenever possible, respect the decisions of the courts of other jurisdictions where it is in force, with a view to ensuring a harmonious national interpretation.

*Southern Industries, Inc. v. Jeremias,* 66 A.D.2d 178, 183, 411 N.Y.S.2d 945, 949 (1978).

and the intervenors for partial summary judgment will be granted.[16]

## III.

The one issue that falls outside the scope of the motion for summary judgment is a claim by Kreditt-Finans and the intervenors that Cia Venetico's arrest of the ANNA PRESTHUS was an abuse of process. With the central issues of this litigation now disposed of, it would seem that Kreditt-Finans and the intervenors might well conclude that the claim has no significant independent existence and would abandon it. If they are of a mind to press the claim, their pre-trial memorandum will be due nine days from the date of filing of this Opinion and Order, and Cia Venetico's responsive pre-trial memorandum will be due one week later; a conference will be scheduled two days later to consider whether there is a viable claim to be tried.

## ORDER

For the reasons set forth in the accompanying Opinion, it is hereby ORDERED that

1. The motion of Kreditt-Finans and the intervenors for partial summary judgment is GRANTED;

2. Kreditt-Finans and the intervenors shall file their pretrial memorandum on the remaining issue in the case within nine days of the date of filing of this Opinion and Order;

3. Cia Venetico shall file its pretrial memorandum within seven days of the filing of the memorandum of Kreditt-Finans and the intervenors.

---

16. In its answer to the complaint of the intervenors, Cia Venetico filed a counterclaim alleging that Kreditt-Finans and the intervenors had participated in a "conspiracy" to defraud Cia Venetico and the courts of Norway and the United States. In their motion for summary judgment, Kreditt-Finans and the intervenors argue that the court lacks subject-matter jurisdiction over this "international conspiracy" claim because it is based on the transfer of ownership on October 11, 1979, of two other Presthus ships in which Cia Venetico has not even alleged an interest. In responding to the motion for summary judgment, Cia Venetico characterizes the counterclaim as "centered around the fraudulent conveyance of title to the ANNA PRESTHUS. The references to the transfer of [the other two ships] are merely evidence of the scope of the conspiracy.... Cia Venetico ... does not ... ask this Court to render decision as to whether the transfers of [the other two ships] are voidable as fraudulent conveyances...." As has already been noted, the transfer of the ANNA PRESTHUS did not injure Cia Venetico. Accordingly, Kreditt-Finans and the intervenors are entitled to summary judgment with respect to Cia Venetico's counterclaim.